[No. B212368. Second Dist., Div. Four. Nov. 25, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
PHOEBUS VINCENT SMITH, Defendant and Appellant.

## Counsel

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan D. Martynec and Lance E. Winters, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MANELLA, J.**—Defendant Phoebus Vincent Smith was charged in a 118-count information with 33 counts of grand theft (Pen. Code, § 487, subd. (a)); 33 counts of sale of unqualified securities (Corp. Code, §§ 25110, 25540, subd. (a)); 33 counts of using false statements to sell securities (Corp. Code, §§ 25401, 25540, subd. (a)); and one count of using a scheme to defraud in

connection with the sale of securities (Corp. Code, § 25541).[1] Counts 1 through 99, the charges of grand theft, sale of unqualified securities and use of false statements in the sale of securities, contained the names of 33 separate victims. At trial, only eight of the named victims testified. After the close of evidence, the court dismissed the counts pertaining to the remaining victims. The court admitted for nonhearsay purposes the approximately 150 agreements executed by the 25 individuals named in the dismissed counts, and permitted the prosecutor to refer in closing argument to those documents and to other similar agreements seized in a search of appellant's home and offices.

Appellant, who was convicted on all the counts that survived dismissal, contends that these documents were not properly authenticated and constituted inadmissible hearsay. In addition, appellant contends that the documents should have been excluded under Evidence Code section 352. Appellant further contends that the prosecutor's alleged improper comment on appellant's failure to testify influenced the jury's verdict and seeks our review of *Pitchess* materials previously reviewed by the trial court.[2]

We conclude that the documents at issue were authenticated by their content and by circumstantial evidence and that their use did not violate the hearsay rule. With respect to Evidence Code section 352, appellant did not raise an objection to the documents based on that provision and, in any event, the documents were more probative than prejudicial. Moreover, assuming arguendo that the documents were improperly admitted, the evidence supporting the charges was so overwhelming that the use of these documents added little to the prosecution's case and any error was harmless. With respect to the alleged prosecutorial misconduct, we conclude it resulted from a misstatement and had no impact on the verdict. Finally, we find no error in the trial court's *Pitchess* review. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Information*

As stated above, the underlying information contained charges of grand theft, sale of unqualified securities, using false statements to sell securities and using a scheme to defraud in connection with the sale of securities. The information further alleged, with respect to certain of the counts, that appellant's actions constituted violations of Penal Code section 1203.045,

---

[1] The information also contained 18 counts of money laundering (Pen. Code, § 186.10, subd. (a)), which were dismissed at the end of trial without objection from the prosecutor.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]. The trial court found no discoverable materials in its review.

subdivision (a) (theft of amount exceeding $100,000). With respect to the combined offenses, the information alleged that appellant's violations fell under Penal Code section 186.11, subdivision (a)(2) (multiple felonies involving fraud or embezzlement resulting in more than $500,000 loss) and Penal Code section 12022.6, subdivision (a)(3) (taking property in commission of felony, loss exceeding $1.3 million).

### B.  *Evidence at Trial*

#### 1.  *Prosecution's Case*

##### a.  *Documentary Evidence*

Eight victims who paid money to invest in appellant's operation testified on behalf of the prosecution. Each of the victims signed one or more investment agreements.[3] In nearly every case, the agreements were between the victims and an entity identified as "Mr. V&S Investments" or "MV&S."[4] At the time of their initial payment, most of the victims also signed "membership enrollment" forms, agreeing to become members of the "Antelope Valley Banking System" or "AVBS."[5] The MV&S agreements were one-page form contracts with spaces to fill in the participant's name and address, the "investment" amounts (the funds paid by the participant) and the maturation dates (the dates on which the returns were to be paid, generally 60 to 90 days in the future). There were also boxes to check for the "anticipated gross" or return on the "investment[s]," labeled "100%," "50%," and "25%." The agreements stated: "MV&S cannot guarantee an investment return. Therefore, to accommodate the risk factor of this high-yield return, Investor may request refund of initial investment amount within ten (10) days after payment date or may re-invest for a term equal to the original agreement in the event of 0% return." The agreements further stated they were valid only if "personally signed" by "Mr. Vince" (a name used by appellant), "Sandie" (an apparent reference to appellant's wife, Saundra Smith) or an "authorized agent."

---

[3] All of the agreements executed by the 33 named victims were contained in a single exhibit—exhibit No. 1. Exhibit No. 1 consisted of 183 pages, each page a separate agreement. Approximately 40 pages of exhibit No. 1 were authenticated by the eight victims who testified that they executed a new agreement every time they invested. We are here referring only to those pages authenticated by the victims who testified.

[4] Several witnesses testified that appellant described himself as the head or owner of MV&S. In addition, appellant's attorney, John Williamson, testified it was appellant's business. MV&S was also linked to appellant through promotional brochures, bearing his picture and MV&S's name.

[5] Williamson incorporated AVBS in 2002 on appellant's behalf. He testified that appellant was its sole shareholder. The corporation's initials did not stand for Antelope Valley Banking System and the corporate business had nothing to do with banking.

One victim, Horace Duplechein, also executed two agreements with an entity identified as "GWV/Investment International." These agreements were signed by appellant and contained terms nearly identical to the MV&S agreements. Two other victims—Irit Lavie and Darren Scott—executed "Home Buyers/Monthly Bill Payment Agreements," a different form with distinct terms. The home buyers agreements, also between the victims and MV&S, stated that a specified investment "will net" a certain amount and did not contain a proviso disclaiming profit.

### b.  *Witnesses' Testimony*

John Henderson testified that he heard about appellant's operation in July 2003 from a flier, which stated that "A.V. Banking System" was offering returns of 25 to 100 percent. He attended a meeting at a restaurant in Lancaster at which appellant spoke. Approximately 30 other people attended. Appellant claimed to be involved in a housing development in Lancaster and to have made additional investments in Las Vegas and other parts of the world. He stated he would pay investors a 50 percent return in 60 days and that under no circumstances would investors lose their original investment.[6] At the meeting, Henderson was referred to Karen Caston, who represented herself as an agent of AVBS. Working directly with Caston, Henderson "invested" a total of $5,000 with MV&S in August and September and paid a $200 "membership" fee. He was promised a 50 percent return. In October, Henderson attended a meeting in Quartz Hill presided over by appellant. There were approximately 50 other people present. Appellant stated that the Lancaster development was experiencing delays, but assured the attendees that their investments were safe. Henderson observed many people confront appellant seeking return of their funds.[7] Henderson was persuaded to renew his "investment" and roll over his funds. In January 2004, Henderson went to MV&S's offices in Palmdale and was persuaded to execute another rollover agreement. Henderson returned to the same location in May 2004, but no one connected with MV&S or AVBS was at the location and the telephone had been disconnected. Henderson never received either the promised return or his original funds back.

Randy Townsend was introduced to appellant by his former pastor at a church in Palmdale in late 2001 or early 2002. Appellant described himself as a wealthy individual who had a "unique system" for investing and wished to help fellow Christians "prosper financially." Appellant said that those who invested with him would likely make a generous profit and would, at a minimum, get their money back. He told people they would have to pay to

---

[6] On cross-examination, Henderson said that appellant did not guarantee a return.

[7] This evidence was admitted not for the truth of the matter asserted, but to establish appellant's state of mind.

join his corporation in order to take advantage of the investment opportunities he offered. At this meeting, other people spoke, claiming to be investors who had been fully paid by appellant. Townsend later attended a meeting at appellant's offices in Palmdale, a meeting attended by approximately 20 others, and was introduced to appellant's wife, Saundra Smith. Mrs. Smith reiterated much of what had been said by appellant, including the promise that original investments were guaranteed. At that meeting, appellant claimed to be associated with large developers known for building homes in the Antelope Valley. He claimed to have a 95 percent success rate in returning profit to his investors. In May 2003, Townsend executed an agreement, paid $5,000 as an "enrollment fee" and paid $25,000 as an "investment."[8] He was promised a 50 percent return within five months. In July or August, appellant appeared at Townsend's church where Townsend and numerous others asked to get their money back. Appellant stated that the funds were secure, but claimed to be having personal problems and problems with his wife. Appellant promised to meet Townsend and the others seeking refunds the next day at his Palmdale office, but did not appear. Townsend saw appellant from time to time thereafter and asked about his funds. Appellant continued to promise to repay Townsend, but never returned Townsend's funds.

Lynn Joshua invested money with appellant in 2003. She heard appellant speak at her church (the same church attended by Townsend). Appellant stated that money invested with him or his companies would double or triple in a very short time. He said the original investment funds were guaranteed. Other people spoke at the meeting and confirmed that investing with appellant had worked out for them. The church's bishop said he had doubled his money in 30 days. Acting on appellant's instructions to those who wished to participate, Joshua went to a Palmdale office and met with Mrs. Smith or Vince Bias. In March 2003, Joshua was persuaded to pay a $5,000 membership fee, $20,000 to become an agent and an additional $12,500 as an investment. She was promised a 100 percent return in 60 days. Joshua subsequently paid $3,000 on behalf of her parents, in exchange for a promise of monthly payments of $1,000. In mid-2003, when the contracts became due, Joshua returned to the Palmdale office to obtain payment and was repeatedly put off by Mrs. Smith. Once, appellant met with Joshua and gave her $500; those were the only funds returned or paid to her by appellant.

De'Nean Coleman-Carew also learned about appellant's operation through her church. She attended a meeting at a restaurant, where appellant stated that any principal invested with him would be safe and that returns would be in the neighborhood of 25 to 50 percent. Appellant said that funds would be invested in real estate and cars. Appellant played a video from a pastor known to Coleman-Carew. The pastor stated that appellant's investment

---

[8] Townsend's agreement was signed by Mrs. Smith.

program worked. In May 2003, Coleman-Carew met with an agent, Craig Henry, paid an enrollment fee, and "invested" $2,500 dollars. She was promised a return of $1,000 by July. In July, she was persuaded by appellant to "reinvest" or roll over the funds. In September, Coleman-Carew took out a $50,000 loan on her home and gave that sum to Henry. She also paid funds on behalf of her father, daughter, cousin and aunt. When Coleman-Carew attempted to obtain the promised payments, Henry repeatedly stated that money would be forthcoming soon. At one point, Coleman-Carew received a letter from appellant documenting the total amount she had "invested" with his organization. At another point, appellant promised Coleman-Carew that all the amounts owed her would be paid by January 2004. Coleman-Carew attended a meeting where she and others asked appellant for refunds. Coleman-Carew never received any payments from appellant.

Riccardo Ainslie became involved in appellant's operation in 2002. He attended a presentation by appellant in Palmdale, where appellant claimed to be generating returns by investing in real estate and by buying and reselling expensive cars. Appellant said those who invested with him could expect a return of 50 percent or more, and that the investments were "not risky at all." Other people present at the meeting confirmed that appellant had paid them promised returns. Appellant invited interested investors to meet with his agents, who were present at the meeting. At the end of 2002, Ainslie met with Angel Avila, one of those identified as an agent, executed an agreement and paid $2,500. He was promised a 100 percent return in 60 days. In January and March 2003, Ainslie made three additional $2,500 "investments" and was promised similar returns. Ainslie persuaded others to give money, including his wife and stepdaughter. Avila repeatedly persuaded Ainslie to roll over the investments rather than obtain actual payment of any returns. During this period, Ainslie attended regular meetings presided over by appellant, where appellant purported to describe the investments he was making with the participants' funds. The meetings were initially attended by 20 to 25 people, but the numbers steadily grew. One of the later meetings was attended by approximately 200 people. Sometime after July 2003, the location where the meetings had been held was shut down and the telephone numbers Ainslie had called to find out the time and date of the meetings was disconnected. Ainslie received no repayment of any of his funds.

Darren Scott made his first "investment"—$5,000—in April 2003, after hearing about AVBS from a friend and prior to meeting appellant. The agreement was signed by and the funds were paid to Vince Bias, who represented to Scott that he was an agent for appellant or AVBS. The agreement promised a 100 percent return by July. Subsequently, Scott attended a meeting of 10 to 15 people in someone's home where appellant gave a presentation purporting to describe the investments AVBS was making with the participants' funds. Appellant promised a high rate of return and said that

invested funds were guaranteed. Appellant confirmed that Bias was his agent and that Bias had transferred Scott's money to appellant's organization. In August 2003, Scott entered into a second agreement for $17,000 ($10,000 in new money and $7,000 rolled over) and was promised payments of $4,000 per month for 15 months.[9] Later, Scott gave appellant $3,000 directly. When Scott and others pressed appellant for payment, appellant blamed Bias for not paying people amounts he was supposed to have paid. Scott received one payment of $5,000 from appellant.

Horace Duplechein learned about appellant's operation when he began working as appellant's bodyguard in 2003. Appellant informed Duplechein that he was a developer of homes. Duplechein attended a meeting where appellant offered to sell individual plots of land to attendees. Appellant represented that the investments were safe and could expect returns of 25 to 100 percent. In July 2003, Duplechein was persuaded by appellant to sign an investment agreement, to pay a "membership" fee and to pay $2,500 as an investment in specific lots. In October, Duplechein signed additional agreements and paid appellant an additional $40,000. When Duplechein sought the payments promised by the contracts, appellant told him the project was experiencing delays. On one occasion, appellant paid Duplechein $5,000. Other than that, Duplechein received no payments from appellant.

Irit Lavie was introduced to appellant by Duplechein in 2003. Lavie attended a meeting at appellant's offices in Palmdale or Quartz Hill. Between 50 and 100 other people were present. Appellant spoke about the development project and promised 30 to 50 percent returns for those who invested with him. In October 2003, Lavie was persuaded to pay $32,500 to appellant. Appellant stated that the sums paid represented both investments for which Lavie would be paid significant sums per month and down payments on two homes. Lavie later paid an additional $50,000 to appellant expecting it to be invested. Appellant represented that the investments were very safe. Lavie never received anything in return for her payments.

Detective David Lingscheit, a fraud investigator for the Los Angeles County Sheriff's Department, explained the basics of a Ponzi scheme: funds are solicited from victims, who are told that the funds will be used for specific investments and pay very high returns within a short period of time. In fact, however, any money paid back to victims comes from funds received from other victims. Part of the scheme involves making payments as promised to early victims, so that they will be induced to bring others into the scheme. The scheme eventually collapses because the amount scheduled to

---

[9] The second agreement was signed by Mrs. Smith.

go out is too great and the money runs out. To prevent the scheme from collapsing too soon, victims are encouraged to roll over funds when payments become due.

Detective Lingscheit also testified to serving search warrants seeking records for 10 bank accounts associated with appellant, MV&S and AVBS, identified by interviewing alleged victims and reviewing their documents. By the time he served the warrants, the accounts had been closed and the balances were at zero. Detective Lingscheit also seized documents pursuant to search warrants at AVBS's offices in Quartz Hill and at appellant's residence. AVBS's files contained over 4,000 executed contracts similar to those signed by the witnesses, all promising returns of 50 to 100 percent.[10] Among the documents seized were the agreements executed by the victims who testified at trial. Detective Lingscheit calculated that the investment amounts on the contracts totaled $8.8 million. Also seized were promotional materials bearing appellant's picture and promising large returns to those who became involved with AVBS and MV&S. In his search, Detective Lingscheit found no evidence of productive activity or business operations, except a preliminary tract map for a property in Lancaster.

Peter Mock, the prosecution's accounting expert, defined a Ponzi scheme as a fraudulent operation involving a promise of abnormally high returns on investments. Payouts are derived from funds received from investors rather than any actual economic or business activity. Mock reviewed the bank records—bank statements, checks and deposit records—obtained by Detective Lingscheit and performed a "cash roll analysis," identifying how much money came in to each account, where it came from and what it was used for. He was able to identify the checks from investors from information written on the checks and from the fact that investment checks were always in round numbers. He identified payments to investors from information written on the checks and by comparing the names of some of the payees to the master list of investors compiled by Detective Lingscheit. Mock concluded that appellant was operating a Ponzi scheme because there did not appear to be any income being generated from investments or operations. All funds coming into the accounts and used to pay investors were obtained from other investors.

The majority of the funds traced by Mock—$1.7 million—went through two of the 10 bank accounts. With respect to those two accounts, 79 to 83

---

[10] Appellant suggests in his brief that reference to these agreements was improper. As discussed in greater detail below, counsel objected prior to the commencement of trial to the admission of a document prepared by Detective Lingscheit, summarizing the 4,000 seized agreements. At trial, however, counsel did not object to Detective Lingscheit's testimony about these agreements.

percent of the funds paid out went to investors. Most of the remainder was paid to appellant or people associated with him, including his lawyer, wife and girlfriend. A relatively small sum was paid to an engineering company.

## 2. Defense Case

Charles Agapiou, a luxury car dealer, testified that he sold several used vehicles to appellant between 2002 and 2004, at a cost of approximately $70,000.

John Williamson, an attorney, testified that he was introduced to appellant in 2002 and was retained to assist appellant in developing a property appellant had acquired in Lancaster. Appellant and his partner or associate bought the property for $400,000. In September 2003, a tentative map was approved, permitting individual lots to be sold. There were 80 lots on the property, and the lots could have sold at that time for approximately $23,000 each. Alternatively, if homes were built and sold (at an estimated cost of $30 million), the profit would have been higher—the estimate Williamson recalled was $15 million. Appellant and Williamson subsequently learned that in order for houses to be built on the land, fill (additional soil) had to be added at a cost of over $900,000. In November 2003, a lawsuit was filed and a lis pendens placed on the property causing progress to come to a halt. In that same month, Williamson met with a group of investors and told them the housing project had the potential of paying off.

Appellant informed Williamson that he had told potential investors that no return was guaranteed, but that their original investments would be returned. However, Williamson had warned appellant that numerous problems could arise during the various stages of development. Williamson believed that guaranteeing investors that their initial investments were not at risk was not "prudent." Williamson believed appellant was not running a Ponzi scheme because as he understood it, newer investors were buying out older investors.

During direct examination, Williamson testified that in 2003, he was asked by appellant to review blank contracts similar to those executed by the victims who testified. Williamson told appellant that the contracts were or could be classified as securities and would need to be registered. By that time, however, appellant had already entered into the agreements and Williamson believed there was nothing to be done. Subsequently, Williamson came to the conclusion that the people involved were "sophisticated investors" and therefore the agreements did not need to be registered. On cross-examination, Williamson was asked to review some of the contracts signed by the victims who testified; he conceded that they were securities.

Williamson was aware of no business activity or investment being undertaken by appellant that would have generated profits in the short timeframe set forth in the agreements.

Kenny Kang was the defense accounting expert. Kang testified that Mock underestimated the amount of funds from the reviewed bank accounts that went toward business expenses. He testified that $131,000 was spent on real estate or real estate development, $12,000 was spent to purchase a pizza parlor and $77,000 was spent on payments related to buying or fixing automobiles. Kang conceded, however, that there was no evidence of income other than payments from investors. Kang expressed the opinion that as long as investors were only taking out the funds that they put in, there was no Ponzi scheme.

Craig Morse testified that he obtained a 70 percent share of the Lancaster property from appellant in 2004 or 2005 by agreeing to pay litigation expenses. Morse intended to develop the property and, toward that end, he obtained a final tract map approximately one year after becoming involved. Morse estimated that had 80 homes been built and sold, there would have been a $5 or $6 million profit to the developer. However, he and appellant did not end up building any homes. Morse eventually sold his share for "millions."

### 3. *Stipulations*

The parties stipulated that none of appellant's companies ever registered securities with the State of California.

Defense counsel stipulated that the documents contained in exhibit No. 1 were seized from appellant's offices pursuant to a search warrant.

### C. *Pertinent Evidentiary Rulings*

Prior to trial, defense counsel objected to the prosecution's apparent plan to introduce an exhibit, prepared by Detective Lingscheit, summarizing the thousands of investment contracts seized in the search of appellant's offices. Defense counsel was concerned that any reference to the contracts' apparent face value—$8.9 million, according to the exhibit—would overstate the size of the operation.[11] Defense counsel was aware that the prosecution also intended to introduce bank records, but those records showed a significantly lesser amount having passed through the bank accounts, and counsel raised no objection to the introduction of bank records. The primary basis for

---

[11] The $8.9 million figure included rollover contracts.

defense counsel's objection to Detective Lingscheit's summary was Evidence Code section 352, but he also raised a hearsay objection. The prosecutor explained that he did not intend to introduce any contracts other than those at issue in the specific counts of the information, but that he wished to inform the jury that appellant had thousands of similar contracts in his possession. The prosecutor contended this evidence was relevant to showing that appellant was engaged in a Ponzi scheme and that it would give the jury a more accurate picture of the scope of the enterprise. The court stated that the information appeared relevant under Evidence Code section 1101, subdivision (b) to show intent to defraud, but agreed with defense counsel that the amount was exaggerated. Ultimately, the court deferred a ruling and the prosecutor agreed not to discuss the number of contracts or their face value in his opening statement.[12]

During trial, immediately prior to Detective Lingscheit's testimony, the prosecutor stated his intention to question the detective concerning the approximately 150 agreements executed by the 25 individuals who were named in the information but not had testified.[13] The prosecutor argued that the documents themselves would prove appellant's sale of unregistered securities to those individuals and arguably also establish the related theft counts. Defense counsel objected on grounds of hearsay and lack of foundation. The court concluded that the documents could not be used to establish substantive counts—either violation of securities law or grand theft—because testimony of the named victims was necessary to establish reliance and other elements. The court stated, however, that the documents could be used to support the theory that appellant was operating a Ponzi scheme. The court observed that the documents, along with the bank records, were circumstantial evidence that the money appellant used to pay investors came from people who had entered into investment contracts with appellant and his companies, and supported the prosecution's theory that this was the only income appellant had to pay investors.

Prior to the beginning of deliberations, defense counsel objected again to exhibit No. 1, stating that the portions that consisted of agreements

---

[12] In his opening statement to the jury, the prosecutor stated that there were "many investors" in appellant's scheme, and that appellant "took advantage of a significant number of people for a significant amount of money." Although appellant states in his brief that this argument was "most improper[]," counsel did not object at trial.

[13] As noted, all of the agreements executed by persons named in the information were compiled in a single exhibit—exhibit No. 1. Approximately 150 pages of exhibit No. 1 consisted of agreements executed by individuals who had not testified and whom the prosecution did not intend to call. These are the documents to which objection was raised. The documents at issue consist largely of investment agreements between MV&S and the individuals and documents enrolling the individuals in AVBS. Many of the agreements executed by nonwitnesses were signed by appellant, Mrs. Smith or Vince Bias. In addition, a number were signed by Tamikia White, identified by Randy Townsend as someone who worked in AVBS's offices.

executed by individuals who did not testify were hearsay and that no adequate foundation had been laid for their admission. The court stated that such contracts were admissible as circumstantial evidence of a scheme to defraud. The court invited defense counsel to submit a limiting instruction clarifying that the documents were introduced for a limited purpose, but defense counsel declined to do so.

### D. *Section 1118.1 Motion*

After the close of the prosecution's case, the defense moved pursuant to Penal Code section 1118.1 to acquit on all the counts that named victims who had not testified. The prosecutor conceded the grand theft counts could not be established without the testimony of the victim, but argued that the agreements themselves established the securities counts. The court concluded that absent the testimony of the persons who entered into the agreements, the prosecution could not prove that the securities were offered for sale in California and that use of the agreements to establish this fact—the documents contained the names and addresses of the participants—would constitute hearsay. The court granted the defense motion, but did not strike or exclude the documentary evidence pertaining to the nontestifying victims.[14] In so doing, the court stated: "[A]lthough I granted [the defense motion], with respect to the non-testifying, quote, unquote, victims, obviously, the People can still argue [the documentary evidence pertaining to those victims] . . . to prove a scheme to defraud and so forth."

### E. *Pertinent Argument*

During closing, the prosecutor asked the jury to reflect "on the enormity of this crime and . . . what [appellant] was up to here. . . . [W]hen they finally got around to doing a search warrant of [appellant's] office, . . . [t]here were in excess of four thousand of these investment contracts with a face value of eight point nine million dollars. That is a lot of people, a lot of lives ruined." Later, in discussing whether appellant was legitimately investing the funds as opposed to engaging in a "scam," the prosecutor stated: "We know that there were four thousand investment contracts totaling almost nine million dollars. . . . We . . . gave you contracts from a representative sample, about thirty percent of the people, so you could see what these contracts looked like." According to the prosecutor, this evidence showed "what [appellant] was doing . . . he was setting up a club to get more and more people to bring more and more people in."

The prosecutor referred briefly to exhibit No. 1 in his closing. He directed the jurors to the portions that contained the agreements executed by the

---

[14] The court also dismissed allegations that certain individual victims lost more than $50,000.

victims who testified and did not discuss the portion of the exhibit pertaining to the dismissed counts and the named victims who had not testified.

The prosecutor identified the misrepresentations made by appellant as (1) promising a high return, (2) guaranteeing that principal was safe, and (3) representing that money was being invested in legitimate business ventures. He also contended that appellant lied by omission, failing to inform participants that any returns paid came from other investors.

The defense argued in closing that there was no evidence of intent to defraud because most of the money collected was used to pay investors. He also pointed to the evidence that appellant had purchased the Lancaster tract of land and was working with others to develop homes on it. Counsel contended this operation could have led to a substantial profit that allowed "[e]verybody [to be] paid back."

In rebuttal, the prosecutor again disputed the suggestion that appellant had been engaged in any legitimate business enterprise. The prosecutor noted that appellant's own accountant had acknowledged that there was no evidence of any productive enterprise, and conceded that the evidence of "money coming in from investors and being paid right out to other investors" was consistent with a fraudulent scheme. The prosecutor then said, "[Y]ou have heard nothing here to explain how this is any sort of legitimate—nothing whatsoever. The defendant had every opportunity to speak to you and to point out how this was not a fraudulent scheme. He couldn't . . . ." Defense counsel interposed an objection. The prosecutor immediately explained that he meant to refer to defense counsel rather than to defendant. The court stated to the jury: "Obviously, it's improper to comment on—in the absence of testimony of the defendant. You're not to consider it and I'll so instruct on it."[15] Before proceeding with his argument, the prosecutor repeated that he had intended to refer to defense counsel and the court advised the jury that "[t]he prosecutor misspoke."

### F.  *Verdict and Sentencing*

The jury found appellant guilty of the 25 remaining counts (eight counts of grand theft, eight of selling unqualified securities, eight of using false statements to sell securities, and one of using a scheme to defraud). In addition, the jury found true that appellant had taken property with a value of

---

[15] After argument concluded, the court read the following instruction to the jury: "[T]he defendant has an absolute constitutional right not to testify. He may rely upon the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider for any reason at all the fact that the defendant did not testify. Do not discuss that fact during the deliberations or let it influence your decision in any way."

more than $50,000 from Carew, Duplechein and Lavie and that the value of property taken from all the victims exceeded $150,000.

The court sentenced appellant to a term of eight years eight months, consisting of: the midterm of two years on count 26 (Corp. Code, § 25110, sale of unqualified securities); eight months or one-third the midterm on counts 5, 41, 56, 68, 74, 89 and 95 (also Corp. Code, § 25110), and two years for the Penal Code section 12022.6 enhancement. As to the remaining counts, sentence was imposed, but stayed, under Penal Code section 654.

## DISCUSSION

A.  *Exhibit 1*

1.  *Authentication*

■  The first issue we consider is appellant's contention that the portions of exhibit No. 1 consisting of agreements or enrollment forms between named victims who did not testify and MV&S or AVBS were not properly authenticated. "A document is not presumed to be what it purports to be . . . ." (*Fakhoury v. Magner* (1972) 25 Cal.App.3d 58, 65 [101 Cal.Rptr. 473].) "Authentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).) "Authentication" means "(a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.) A trial court's finding that sufficient foundational facts have been presented to support admissibility is reviewed for abuse of discretion. (*People v. Lucas* (1995) 12 Cal.4th 415, 466 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 319 [94 Cal.Rptr.3d 198]; *Molenda v. Department of Motor Vehicles* (2009) 172 Cal.App.4th 974, 999–1000 [91 Cal.Rptr.3d 792].)

■  Evidence Code sections 1410 through 1421 list various methods of authentication of documents—e.g., by the testimony of a subscribing witness or a handwriting expert—but these methods are not exclusive. (Evid. Code, § 1410; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372 [37 Cal.Rptr.2d 596].) "California courts have never considered the list set forth in Evidence Code sections 1410–1421 as precluding reliance upon other means of authentication." (*People v. Olguin, supra,* at p. 1372.) "Circumstantial evidence, content and location are all valid means of authentication . . . ." (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383 [108 Cal.Rptr.2d 809].)

In *People v. Olguin,* for example, several sheets of rap lyrics were authenticated as having been authored by the defendant through evidence

establishing their location when found—his bedroom—and their content—referring to the defendant's gang and identifying the composer with the defendant's gang moniker. Accordingly, they were properly admitted to establish the defendant's gang membership, his loyalty to his gang, his familiarity with gang culture, and "inferentially, his motive and intent on the day of the killing." (*People v. Olguin, supra,* 31 Cal.App.4th at p. 1373.) Similarly, in *People v. Gibson,* two manuscripts were authenticated as the defendant's writings by their content—references to the author as "Sasha," one of the defendant's aliases, and descriptions of a prostitution enterprise similar to one operated by the defendant as established by independent evidence—and the locations from which they were seized—the defendant's home and hotel room. The Court of Appeal held that the trial court had not erred in permitting the prosecution to use the documents to show that the defendant was acting as a madam. (*People v. Gibson, supra,* 90 Cal.App.4th at p. 382; see also *People v. Miller* (2000) 81 Cal.App.4th 1427, 1445 [97 Cal.Rptr.2d 684] [deceased victim's charge account records authenticated in part because items described were found in defendant's possession]; *U.S. v. Moran* (9th Cir. 2007) 493 F.3d 1002, 1010–1011 [computer files authenticated where computer was seized from defendant's home, access to files was protected by password, one account was in defendant's name, and files contained records related to defendant's business, including data about its principals, clients and programs].)

■ Circumstantial evidence, location and content were sufficient to authenticate the documents at issue here. They were found filed in AVBS's offices, intermingled with the agreements and enrollment forms authenticated by the testifying victims. The printed portions of the documents at issue were identical in every respect to the agreements and enrollment forms authenticated by the witnesses. The blanks in the investment agreements were filled out in a similar manner to those authenticated by the witnesses (with the names and addresses of the participants, the amount of the investments and boxes checked to indicate the amount of anticipated returns). The investment agreements identified the party promising to pay returns as MV&S, appellant's company. Further proof of authenticity came from the fact that most were signed by appellant, Mrs. Smith, Vince Bias—who had been identified as an agent for AVBS by the witnesses—or Tamikia White, who had been identified by Randy Townsend as an employee of AVBS. This evidence was sufficient to establish that the documents were what they purported to be—agreements between third parties and MV&S. The trial court did not abuse its discretion in concluding that the objection based on lack of authentication should be overruled.

### 2. *Hearsay*

■ We next turn to whether the documents at issue constituted inadmissible hearsay. Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) For purposes of the hearsay rule, a "[s]tatement" is defined as an "oral or written verbal expression" or "nonverbal conduct of a person intended . . . as a substitute for oral or written verbal expression." (Evid. Code, § 225; see *People v. Lewis* (2008) 43 Cal.4th 415, 497–498 [75 Cal.Rptr.3d 588, 181 P.3d 947].) Hearsay is not admissible unless it qualifies under some exception to the hearsay rule. (Evid. Code, § 1200, subd. (b); *People v. Lewis, supra,* at pp. 497–498.)

■ " 'If a fact in controversy is whether certain words were spoken or written and not whether the words were true, evidence that these words were spoken or written is admissible as nonhearsay evidence.' " (*People v. Fields* (1998) 61 Cal.App.4th 1063, 1068–1069 [72 Cal.Rptr.2d 255], quoting 1 Jefferson, Cal. Evidence Benchbook (3d ed. 1997) Hearsay and Nonhearsay Evidence, § 1.45, p. 31; see *Jazayeri v. Mao, supra,* 174 Cal.App.4th at p. 316 ["Documents not offered for the truth of the matter asserted are, by definition, not hearsay."]; 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 31, p. 714 [where " 'the very fact in controversy is whether certain things were said or done . . . the words or acts are admissible not as hearsay[,] but as original evidence' "]; Advisory Com. Note to Fed. Rules Evid., rule 801(c), 28 U.S.C. ["If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."].) Written or spoken words offered as original evidence rather than for their truth are generally referred to as "operative facts." (*Jazayeri v. Mao, supra,* 174 Cal.App.4th at p. 316; *People v. Fields, supra,* 61 Cal.App.4th at p. 1069.)

■ As discussed above, the prosecutor initially offered the documents for the truth of matters stated in them. He contended that information written on the agreements—the participants' addresses and the investment amounts—established that appellant violated California securities law by offering and selling unregistered securities in the state and that appellant defrauded these parties by taking their funds under false pretenses. However, the court correctly ruled that the documents would be inadmissible hearsay if offered for those purposes. The court concluded that the documents were nonetheless admissible to establish appellant's intent and the size and nature of the scheme—that appellant's operation encompassed more participants than the

eight witnesses who testified and that the promised payments could not be made unless greater and greater numbers were induced to participate. Thus, our review focuses on whether the documents supported the nonhearsay purposes identified by the court and whether those purposes were relevant to an actual issue in dispute. (See *People v. Bunyard* (1988) 45 Cal.3d 1189, 1204 [249 Cal.Rptr. 71, 756 P.2d 795], quoting *People v. Armendariz* (1984) 37 Cal.3d 573, 585 [209 Cal.Rptr. 664, 693 P.2d 243] ["[A]n out-of-court statement is not made admissible simply because its proponent states a theory of admissibility not related to the truth of the matter asserted. . . . '. . . The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute.' "].)

■ Preliminarily, we note that fraudulent intent is an element of grand theft and the offense of use of false statements in the sale of securities. (See, e.g., *People v. Shirley* (1978) 78 Cal.App.3d 424, 436 [144 Cal.Rptr. 282] [elements of theft by false pretenses include making false pretense or representation with intent to defraud the victim of his or her property]; *People v. Simon* (1995) 9 Cal.4th 493, 522, 37 Cal.Rptr.2d 278 [886 P.2d 1271] ["[K]nowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in [Corporations Code] section 25401."].) Moreover, appellant's actual intent was put in issue by the defense when it introduced evidence that appellant was involved in a legitimate land development operation and argued that the profits that could have been derived from that enterprise would have been sufficient to pay investors.

The documents were probative of appellant's intent. By virtue of their authentication, the documents must be deemed to be what they purported to be—agreements between entities under the control of appellant and dozens of third parties. Without regard to whether the information written on any individual agreement was true or whether these particular individuals were defrauded, the agreements as a whole established that appellant promised to pay fantastic returns not just to the eight victims who testified, but to numerous others. The sheer number of agreements entered into by appellant supported the prosecution's theory that appellant was generating money to pay existing investors only by soliciting new ones, and not—as appellant claimed—through any legitimate real estate development. Had the evidence been limited to appellant's interaction with the eight witnesses, the defense's argument that appellant intended in good faith to compensate investors from the anticipated profits on development of the Lancaster property would have had more force. As appellant states in his brief: "In the absence of the 150 or

so [investment contracts at issue], appellant's trial would have been limited to an evaluation of the mere eight victim-investors who[] actually appeared at trial, and of their handful of contracts." The fact that appellant or the entities he controlled entered into significantly more agreements than the relative handful attested to by the witnesses supported the inference that appellant's intent in dealing with the eight victims named in the counts submitted to the jury was fraudulent.

The documents were also relevant to explain to the jury how a Ponzi scheme works. While the precise nature of the scheme was not an element of any of the charged offenses, the prosecution was entitled to demonstrate why, in such a scheme, some initial investors would be paid off. Had the jurors not understood that a Ponzi scheme requires an initial group of "satisfied customers," they might have concluded that the failure to pay the eight testifying victims was the result of bad luck or intervening factors, such as the lawsuit over the Lancaster property or the unexpected need for additional fill. The prosecutor's Ponzi scheme explanation made clear that appellant's inability to pay investors their promised returns or to refund their investments was an inevitable outcome of the operation he put in motion.

### 3. *Section 352*

Appellant contends on appeal that the court should have rejected under Evidence Code section 352 the agreements executed by named victims who did not testify, because their probative value was outweighed by their prejudicial effect. As respondent points out, however, appellant failed to raise that objection to exhibit No. 1.[16] It has long been the rule that "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] . . . [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." (Evid. Code, § 353, subd. (a).)

Moreover, even were we to consider the merits, we would conclude that exclusion under Evidence Code section 352 would not have been appropriate. For the reasons discussed, the documents were probative of appellant's intent and helped establish that appellant was operating a Ponzi scheme. Appellant contends that admission of the documents may have caused the jury to presume that each of the signatories was a victim of fraud, theft and/or

---

[16] Appellant suggests in his opening brief that Evidence Code section 352 was raised, pointing to counsel's earlier objection on that ground to the summary of the 4,000 seized contracts prepared by Detective Lingscheit. As noted above, appellant's section 352 objection was directed to the summary (which was not introduced), not to exhibit No. 1.

misrepresentations and that "appellant did not pay back any of these non-testifying investors either." The court offered to give a limiting instruction, which defense counsel declined, presumably because he did not wish to highlight the uses to which the jury could properly put the documents. Accordingly, the prejudice identified by appellant was invited.

### 4.  Harmless Error

While we conclude the documents were admissible for the reasons stated, we further believe that appellant would have been found guilty of the charges of which he was convicted with or without the documents. The evidence that he had defrauded the eight victims, sold them unregistered securities and committed fraud in the sale of the securities was overwhelming, as was the evidence that for purposes of Corporations Code section 25541, he "willfully employ[ed]" a "device, scheme, or artifice to defraud in connection with the offer, purchase, or sale of [a] security." The eight victims met with appellant under a wide variety of circumstances, at churches, at restaurants and in his offices. Only two were acquainted with each other. Yet, all told essentially the same story. Appellant represented himself as a brilliant businessman who earned large profits through legitimate enterprises such as real estate development and buying and selling expensive cars. He promised extraordinary returns on investments—50 to 100 percent every 60 to 90 days. He promised all participants that their funds would be safe. The truth was revealed not only by the prosecution's accounting expert, but also by appellant's own witnesses: there were no profits from any investment or income from any legitimate business activity. The sole source of funds that went into the bank accounts from which some lucky investors were paid was derived from their fellow investors.

Even had the jurors not been provided the documentation relating to the 25 nontestifying victims, they would have been aware from the testimony of the victims who did appear that appellant's operations attracted large groups of people—up to 200 at one meeting according to Ricardo Ainslie—eager to listen to appellant and to take advantage of the opportunity he purported to offer. The jury would also have learned that the search of appellant's offices resulted in the seizure of 4,000 investment agreements. In addition, the experts' testimony revealed the existence of bank accounts controlled by appellant through which large sums of money passed in a relatively short period of time, although appellant was not generating income from any legitimate business or investment. The jury did not need the documents at issue to conclude that appellant was deriving funds from scores of individuals. The admission of the contested documents did not substantially alter the picture of appellant or his operation presented by the other evidence.

### B. *Prosecutorial Misconduct*

■ Appellant contends that by commenting on "defendant['s]" failure to explain any way in which his operation did not constitute a fraudulent scheme, the prosecutor committed *Griffin* error. *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] prohibits reference to a defendant's failure to take the stand in his own defense. (*People v. Lewis* (2004) 117 Cal.App.4th 246, 257 [12 Cal.Rptr.3d 1].) However, the *Griffin* rule " ' "does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses" ' " and a prosecutor's allusion to the defense's failure to present exculpatory evidence "does not ordinarily violate *Griffin* or erroneously imply that the defendant bears a burden of proof [citations]." (*Ibid.*; accord, *People v. Stewart* (2004) 33 Cal.4th 425, 505–506 [15 Cal.Rptr.3d 656, 93 P.3d 271]; *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1006, fn. 2 [50 Cal.Rptr.3d 875].) The prosecutor promptly explained that he misspoke, intending to comment on *defense counsel's* failure to provide a legitimate explanation for evidence his own accountant acknowledged was consistent with a fraudulent scheme. It is unlikely the comment would have been understood by the jury as improperly referring to appellant's failure to testify.

Moreover, even had the jury interpreted the prosecutor's remarks as a comment on appellant's failure to take the stand on his own behalf, "indirect, brief and mild reference[s] to defendant's failure to testify as a witness . . . have uniformly been held to be harmless error." (*People v. Mincey* (1992) 2 Cal.4th 408, 446–447 [6 Cal.Rptr.2d 822, 827 P.2d 388].) In addition, a prompt admonition by the court to disregard the statement is generally deemed to remedy the problem arising from improper argument by the prosecutor. (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386 [85 Cal.Rptr.3d 448].) Here, the court quickly admonished the jury not to consider the comment and later instructed the jury that appellant's failure to testify could not be considered for any reason at all. We conclude, therefore, that the prosecutor's misstatement did not improperly influence the verdict.

### C. *Pitchess*

Appellant filed a *Pitchess* motion seeking "all relevant citizen complaints for racial bias, fabrication of evidence, false arrest and other dishonesty in the personnel records of the Los Angeles County Sheriff Detective David Lingscheit." The trial court conducted an in camera review and found "no discoverable information." Appellant requests that we independently review the trial court's conclusion. We have independently examined the materials the trial court scrutinized (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229 [114 Cal.Rptr.2d 482, 36 P.3d 21]), and conclude there is no basis to disturb its ruling on the *Pitchess* motion.

## DISPOSITION

The judgment is affirmed.

Epstein, P. J., and Willhite, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 10, 2010, S179253.