Filed 7/8/13  P. v. Herrera CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B236620 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA371819) |
| v. | |
| CHRISTOPHER HERRERA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Monica Bachner, Judge.  Affirmed.

Alan Stern, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Christopher Herrera (appellant) of attempted, willful, deliberate, and premeditated murder (count 1; Pen. Code, §§ 664/187, subd. (a));[1] and shooting from a motor vehicle (count 2; § 12034, subd. (c)), with allegations as to both counts that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).[2] We affirm the judgment.

## FACTS

On May 25, 2010, Los Angeles Police Department (LAPD) Officers Rick Corpel and Jose Merida witnessed a drive-by shooting of two pedestrians. The officers followed appellant's car for about four or five houses waiting for a potential stolen vehicles report. Appellant's vehicle approached two pedestrians, a male and a female, walking on the sidewalk. Both officers heard gunshots and saw muzzle flashes coming from inside appellant's car. The male pedestrian fell to the sidewalk and the female pedestrian screamed.

Appellant sped off and dropped a gun out of the car. The officers radioed for help and pursued the car with its lights and sirens on. After a short high speed chase, appellant lost control of the car and crashed into parked cars. Appellant fled the vehicle immediately after the crash. Torres stepped out of the car yelling, "Don't shoot me. Don't shoot me. I've been shot." The officers took Torres into custody and discovered that he had suffered a gunshot wound inflicted days before.

Appellant fled to the home of Santiago M. on South Soto Street. Santiago was an associate of the White Fence gang and his moniker was "Silent." Appellant knocked on the window and asked Santiago to let him inside. Appellant was breathing hard and appeared as if he had been running. Appellant was bleeding. Santiago heard appellant praying in English but he did not understand what he was saying. Santiago's sister,

---

[1] All further section references are to the Penal Code except as noted.

[2] Andrew Torres faced the same charges but the jury was unable to reach a verdict as to him; he is not involved in the current appeal.

Ramona M. heard appellant mumbling, saying, "I'm sorry," "I fucked up," and "I think I shot some fool."

Officer Corpel radioed for a K-9 unit. When the K-9 arrived, it picked up a visible blood trail leading down the street to Santiago M.'s home on south Soto Street. Officers followed the trail to find blood splattered on the concrete sidewalk in front of Santiago's door. Santiago guided officers through his home. The officers found appellant, bleeding "profusely from the left hand." Officer Corpel requested assistance for appellant's injury and placed him into custody. Torres and appellant both admitted membership in the White Fence gang.

A black nine-millimeter pistol was recovered on the ground near the scene of the car crash. Officer Corpel identified the gun as the weapon that appellant tossed from his vehicle. The officers also found two spent shell casings in appellant's car. A third was found when the car was impounded. All the shells were shown by scientific methods to have been ejected from the nine millimeter that officers found on the street.

The victim, Juan Hernandez, suffered a wound in his left thigh and was hospitalized. Detective Ernest Garcia interviewed him and photographed his injury. Hernandez was not available to testify at trial, nor was the female pedestrian who accompanied him.

The prosecution presented evidence from a gang expert to prove the shooting was for the benefit of the White Fence criminal street gang. The gang evidence showed that appellant was an admitted member of the White Fence gang and had gang-related tattoos on his body. His moniker was "Lil One." Torres also admitted ties to the White Fence gang; his moniker was "Neto." The White Fence gang claims territories in East Los Angeles, Northeast Los Angeles and Hollywood. Some of their territory boarders the Cuatro Flat's gang territory. The shared boarder causes a bitter rivalry between the two gangs. Officer Jacob Avalos testified that Juan Hernandez actively participated in Cuatro Flats and goes by the gang moniker "Scooby."

Before the shooting in this case, Cuatro Flats members shot Torres in White Fence territory. As a result, White Fence members sought to perform retaliatory shootings against Cuatro Flats members. Officer Avalos testified that Cuatro Flats increased their presence in White Fence territory. He also noticed increased Cuatro Flats gang graffiti in White Fence territory.

Gangs claim territory by marking property in the area with graffiti, a practice called "tagging." Gang members include their own gang moniker on the graffiti they create to show allegiance. Officer Avalos testified he had never heard of a gang moniker included in graffiti where the gang member was not present during the tagging.

The night of the shooting in this case, officers noticed gang graffiti outside Santiago's home, where appellant was found after the crash. The graffiti referenced the White Fence gang and included the monikers "Lil One" and "Neto." Next to the White Fence graffiti, Cuatro Flats graffiti had been crossed out, demonstrating disrespect for that gang. Above the crossed out Cuatro Flats name, was written "187" – the Penal Code section for murder.

Appellant testified on his own behalf at trial. He admitted he joined the White Fence gang when he was 15 years old, but said he did so only after he was pressured by his friends. Most of appellant's tattoos were also the result of peer pressure; however, one tattoo of a "C" on his ring finger stood for "Crystal," his girlfriend. Crystal T. became his girlfriend when he was 16 years old and she was 21. Appellant and Crystal lived together beginning when he was 17.

Appellant met Juan "Scooby" Hernandez when he was 16 years old, approximately two years before the shooting. He testified that Hernandez had no affiliation to Cuatro Flats but that the two of them talked and smoked marijuana together. Appellant introduced his girlfriend Crystal to Hernandez.

At "some point," appellant started to make a change in his life. He began drug rehabilitation and working in the liquor store at the Staples Center. He kicked Crystal out of his home because she had her own drug problem. After that, appellant saw Crystal

4

being affectionate with Hernandez at a restaurant. Appellant argued with Hernandez and then left.

Around the time of the shooting, appellant received calls from Hernandez in which he claimed to be "fucking [appellant's] mom and fucking [appellant's] sisters." Appellant grew angry after receiving the inflammatory phone calls, but he did not react because he was no longer dating Crystal. However, Hernandez wanted to "square" the conflict with appellant. So, he accepted Hernandez's invitation to meet him at an abandoned house in White Fence territory where Torres lived. When appellant arrived, Hernandez said "jump bitch," pulled out a hand gun, and shot at appellant's feet. Appellant jumped to avoid any harm and quickly left. Later that day, he bought a gun from a friend.

Appellant went to Torres's abandoned house to discuss the incident because Torres was close with Hernandez. Appellant and Torres had some food and beer and decided to drive over to appellant's sister's house at about 1:00 a.m. En route to his sister's home, appellant saw Hernandez walking down the road. Without discussing his plan with Torres, appellant pulled the car over about 5 to 10 feet from Hernandez. He pulled a gun from under the seat, yelled "Jump, bitch," and fired two rounds at the ground to scare Hernandez. Appellant heard Hernandez scream, which made appellant think Hernandez had been hit by one of the rounds

Appellant glanced around after the shooting and saw the police car behind him. He sped away, threw the gun out the window and crashed his car. He left Torres in the car and ran to Santiago's home, where he hid in the bedroom and remarked that he had "fucked up."

Appellant denied that the attack was gang related or done with intent to kill. Instead, he was retaliating for what Hernandez did and meant only to intimidate him. Further, Appellant denied that he "tagged" the graffiti outside Santiago's home. He testified that the prosecution's gang expert confused the tag "Littles" for "Lil One," and therefore he did not participate in the graffiti.

The jury convicted appellant. Appellant filed a timely appeal.

5

## DISCUSSION

Appellant contends his conviction for attempted premeditated murder must be reversed, or the premeditation finding reversed, because the trial court erred in admitting photographs of the graffiti on the wall of Torres' house.[3] As noted, the graffiti referenced the White Fence gang and included the monikers "Lil One" (appellant) and "Neto" (co-defendant Torres). Next to the White Fence gang graffiti, Cuatro Flats graffiti was crossed out and "187"—the Penal Code section for murder – was placed above that crossed out graffiti. Appellant argues the graffiti was not properly authenticated as having been written by him, and that admission of the photographs was highly prejudicial given his defense that the shooting was not gang-related and was not committed with the intent to kill. We disagree.

Graffiti is a writing (Evid. Code, § 1410.5, subd. (a)); and must be authenticated as a prerequisite to admissibility. (*People v. Marshall* (1996) 13 Cal.4th 799, 832-833 (*Marshall*); Evid. Code, § 1401; see also Evid. Code, § 403, subd. (a)(3).) Authentication requires proof by a preponderance of evidence that the writing is what the proponent of the evidence claims. (*Marshall*, at pp. 832-833; Evid. Code, § 1400.) There is no strict requirement or restriction on how a party authenticates a writing. (See Evid. Code, § 1410.) A party may validly authenticate a writing by circumstantial evidence; its content and location are valid means of proof. (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383.) We review the lower court's determinations that sufficient facts have been presented for admissibility for an abuse of discretion. (*People v. Lucas* (1995) 12 Cal.4th 415; *People v. Smith* (2009) 179 Cal.App.4th 986, 1001.)

We find *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*) instructive. In *Olguin* the trial court admitted rap lyrics found in a defendant's home. (*Id.* at p. 1373.) The lyrics were handwritten, referenced the defendant's gang moniker, his gang membership and referred to a nickname derived from defendant's first name. (*Id.* at p. 1372.) The Court of Appeal agreed, ruling that regardless of when the lyrics were

---

[3] We do not understand appellant to challenge his conviction for shooting from a vehicle, an offense he openly admitted during his testimony at trial.

written, "[b]oth the content and location of these papers indentified them as the work of [the defendant]." (*Id.* at p. 1373.)

The facts providing authentication here were similar. Officers Corpel and Merida testified the graffiti was outside the building where appellant fled and was found after shooting Hernandez. The building was home to an affiliate in appellant's White Fence gang. The gang expert testified the gang monikers were those of appellant and Torres. Officer Avalos testified that he had never heard of a gang moniker included in graffiti where the gang member was not present at the tagging. Appellant's testimony that the graffiti did not relate to him went to the weight of the evidence, but did not undermine its admissibility. The trial court did not abuse its discretion when finding there was sufficient circumstantial evidence that appellant was either present when the graffiti was written or authored it himself.

Even if there were error in admitting the graffiti, it was harmless. The erroneous admission of unauthenticated evidence is reversible only where the defendant can show he would have achieved a more favorable result had the evidence been excluded. (*People v. Beckley* (2010) 185 Cal.App.4th 509, 517; and see also Cal. Const., art VI § 13; Evid. Code, § 353, subd. (b); *People v. Watson* (1956) 46 Cal.2d 818, 836.) Appellant's arguments on appeal fail to persuade us that he would have had a more favorable result at trial if the gang graffiti evidence had been excluded.

First, we agree with respondent that the jury's failure to reach a verdict on Torres, appellant's co-defendant, shows that the jury did not give the graffiti evidence significant weight as proof of the substantive offenses. Appellant's moniker and Torres's moniker both appeared in the graffiti, but the jury only convicted appellant. Torres's defense was that he did not know the shooting was going to take place and thus could not have been an aider and abettor. Appellant admitted he did the shooting, but denied premeditation and denied it was gang-related. We see little if any distinction in the importance of the graffiti to either of the defendants' cases as to the substantive offenses, but the jury convicted appellant and could not reach a verdict as to Torres. Clearly, the jury did not consider the photographic graffiti evidence the linchpin to conviction.

7

Appellant argues he would have achieved a more favorable result because "the sum total of the unauthenticated graffiti indicated a clear planned intent to kill a Cuatro Flats gang member." We view the record differently. Other evidence in the record showed with more weight that appellant intended to and attempted to kill Hernandez. Appellant had reason to retaliate against Hernandez because he was a Cuatro Flats gang affiliate. Appellant admitted he was a member of the White Fence gang, and expert testimony outlined the tensions between White Fence and Cuatro Flats. Appellant was armed with a gun and in the car with Torres, who had been shot days earlier by a Cuatro Flats gang member. Hernandez shot at appellant earlier the same day. Thereafter, appellant immediately bought a gun and used it within hours to retaliate against Hernandez. In addition, Hernandez was the man with whom his live-in girlfriend began dating after the two split up. Added to that, Hernandez repeatedly told appellant that he was "fucking" his mother and his sisters. Given such evidence, appellant's argument fails to convince us that the photographed graffiti caused the jury to find intent, premeditation or deliberation.

## DISPOSITION

The judgment is affirmed.


BIGELOW, P. J.

We concur:


FLIER, J.


GRIMES, J.

8