Filed 4/10/13  P. v. Romero CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C066658 |
| v. | (Super. Ct. No. CRF090945) |
| MICHAEL RENE ROMERO, | |
| Defendant and Appellant. | |

A jury convicted defendant Michael Rene Romero of attempted murder, mayhem, attempted robbery, assault by means of force likely to produce great bodily injury, and criminal street gang activity.  The jury also found true various enhancement allegations, such as that defendant committed particular offenses for the benefit of a criminal street gang.

Defendant now contends (1) the trial court erred in admitting -- pursuant to the adoptive admission exception to the hearsay rule -- incriminating statements made by

1

defendant's cohort, because there was no evidence that defendant heard and adopted the statements; (2) the trial court violated defendant's Sixth Amendment right to confrontation when it admitted a witness's statement that defendant and his cohort said the "Red Nose Pittz" gang was "about beating people up"; (3) the trial court erred in admitting letters attributed to defendant because the letters were not authenticated; (4) the trial court erred in instructing the jury that a person is "equally guilty" of a crime whether he or she committed it personally or acted as an aider and abettor; and (5) there is insufficient evidence that defendant committed the offenses to benefit a criminal street gang.

We conclude (1) the trial court did not abuse its discretion in admitting the cohort's statements pursuant to the adoptive admission exception, because there was sufficient evidence supporting a reasonable inference that defendant adopted the statements as true; (2) defendant's confrontation clause claim fails because the witness was subjected to cross-examination at trial and the referenced statement was not testimonial; (3) the content of the challenged letters and the manner in which they were obtained provided sufficient authentication; (4) although the trial court instructed the jury with former CALCRIM No. 400, defendant has not established prejudice because the trial court also properly instructed the jury with CALCRIM 401 regarding the required mental state for aiding and abetting, and even if the jury rejected the prosecution's theory that defendant was the direct perpetrator of the attempted murder, substantial evidence supports the prosecution's alternate theory that defendant aided and abetted the commission of the offense; and (5) substantial evidence supports the jury's gang enhancement findings.

We will affirm the judgment.

BACKGROUND

David Eid was driving on West Capitol Avenue in West Sacramento around 3:00 a.m. on January 21, 2009, when he saw two Hispanic males beating a man. Jacques Harpst was the victim.

At first Harpst was on his feet and the attackers were "swinging on him." But after Eid drove past the group, he looked in his rearview mirror and saw Harpst go down on his back and stop moving. One of the attackers stood at Harpst's head and struck Harpst on the head and chest; the other attacker stood at Harpst's feet and kicked Harpst.

Eid made a U-turn and stopped his vehicle across from the attackers. The attackers paused, one of them looked up, but then both resumed beating Harpst, "wailing on him pretty good again." According to Eid, the attacker standing over Harpst's head hit Harpst a lot harder than the second attacker, delivering rapid blows to Harpst's head and kicking Harpst. The second attacker stood back and kicked and stomped on Harpst hard. It appeared to Eid that the attackers "were having a good time." Eid never saw Harpst fight his attackers or defend himself.

Eid drove and revved his engine but the attackers continued hitting Harpst. Eid then stopped his truck in front of Harpst and the attackers fled. Eid testified he did not see the attackers' faces.

Eid saw Harpst bleeding profusely from the mouth, ear and nose. Harpst was unconscious, his eyes were swollen to the size of golf balls, and he was making gurgling sounds. Harpst's pants pockets were pulled out but he still had a wallet with $14.99 in cash.

A surveillance video at a nearby market showed two individuals, one wearing a white jacket and the other wearing a black sweatshirt and a white hat. The prosecution presented evidence that prior to the attack, codefendant Antonio Delgado was with defendant near West Capitol Avenue. Delgado wore a white jacket and a red knit cap

3

and defendant wore a dark-colored hoodie sweatshirt or jacket and a white baseball cap. Police subsequently seized a white jacket and a red knit cap from Delgado's residence.

After viewing the surveillance video from the market, police spoke with nearby residents, including Erica Raya, a friend of Delgado's girlfriend Vanessa Ramos. Raya said Ramos, Delgado and defendant had been at Raya's apartment, that Delgado and defendant left to get cigarettes, and when they returned about two hours later, Delgado said he and defendant beat someone up.

Ramos told police that Delgado and defendant left Raya's apartment to bum a cigarette from someone. When Delgado and defendant returned, Ramos saw a tooth stuck in defendant's hand and defendant's hands were bloody. Delgado told Ramos that when he asked someone walking by for cigarettes, the person "flipped out" and threw cigarettes at Delgado. Delgado and defendant hit the person and Delgado checked the person for money.

Defendant told Ramos he punched the person because he thought the person was going to hit Delgado. Defendant said he hit the person in the face and mouth. The prosecution presented evidence that Delgado and defendant were members of the Red Nose Pittz, a subset of the Norteño street gang.

Harpst was hospitalized for about three months. He had bleeding in the brain, brain tissue injury, fractures to most of the bones in his face, and missing teeth. He received reconstructive surgery on his face, head and nose. The attack affected Harpst's senses, balance and ability to communicate. He had no memory of the attack.

Defendant's first trial resulted in a mistrial. In a second jury trial, the jury convicted him of attempted murder (Pen. Code, §§ 21a, 187, subd. (a), 664, subd. (a) -- count 1), mayhem (§ 203 -- count 2),[1] attempted robbery (§§ 211, 664, subd. (a) -- a

---

[1] Undesignated statutory references are to the Penal Code.

lesser included offense to count 3), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1) -- count 4), and criminal street gang activity (§ 186.22, subd. (a) -- count 5). The jury also found true the allegations that the attempted murder was willful, deliberate and premeditated (§ 664, subd. (f)), that defendant willfully and personally inflicted great bodily injury upon the victim and said injury caused the victim to become comatose due to brain injury (§ 12022.7, subd. (b)), and that defendant committed the felonies alleged in all counts except count 5 for the benefit of, at the direction of or in association with a criminal street gang with the specific intent to promote, further or assist in any criminal conduct by gang members (§ 186.22, subd. (b)(1)).

The trial court sentenced defendant to an aggregate term of 28 years eight months to life as follows: 15 years to life, plus five years for the section 12022.7, subdivision (b) enhancement on count 1, the upper term of eight years on count 2, and one-third the middle term (eight months) on count 3. The trial court imposed and stayed sentences on counts four and five, and on the enhancements on counts two through five, pursuant to section 654.

## DISCUSSION

### I

Defendant contends the trial court erred in admitting -- pursuant to the adoptive admission exception to the hearsay rule -- incriminating statements made by Delgado to Ramos and Raya. Defendant argues there was no evidence that he heard and adopted Delgado's statements. Defendant says Ramos and Raya did not establish defendant's exact location in Raya's apartment when Delgado implicated defendant in the attack, and the fact that Raya's apartment was small was insufficient to prove that defendant heard Delgado's statements.

5

## A

Ramos and Raya testified at Delgado's trial and defendant's trials. The same judge presided at each trial. The testimony by Ramos and Raya at defendant's first trial indicated that Raya had a small one-bedroom apartment with no wall between the kitchen and the living room. While defendant was in the living room or at the kitchen table and Delgado was in the living room, Delgado said defendant hit and kicked the victim, they were trying to get money and cigarettes from the victim, and they got cigarettes from the victim. Defendant did not deny Delgado's statements.

The trial court found, based on statements Ramos and Raya made to police and their testimony at defendant's first trial, that Delgado's statements implicating defendant were admissible as adoptive admissions because the statements were made in defendant's presence, the jury could find that defendant heard Delgado's statements, and defendant failed to deny Delgado's statements.

Accordingly, at defendant's second trial, Raya was permitted to testify as follows: Ramos, Delgado and defendant were at Raya's apartment the evening of January 20, 2009. At some point in time, Delgado left the apartment to get a cigarette. Defendant followed Delgado. The two returned to the apartment out of breath. Thereafter, Raya heard sirens. Delgado told Ramos he wanted a cigarette and "the guy fought him, and they fought and they robbed him." Delgado said he checked the victim for money and they got money and cigarettes from the victim. When Delgado was speaking, Raya, Ramos, Delgado and defendant were in the living room, but defendant could have been at the kitchen table, which was very close to the living room. Defendant did not say anything. The following morning, Raya saw Delgado with a handful of red-colored Marlboro brand cigarettes.[2]

---

[2] Harpst smoked red-colored Marlboro brand cigarettes.

6

Ramos was also permitted to testify about incriminating statements made by Delgado. Ramos testified as follows: Delgado left Raya's apartment to get cigarettes. Defendant was already outside the apartment. When Delgado and defendant returned to the apartment, defendant was out of breath and his hand was bleeding. Ramos checked Delgado's white jacket for blood but found none. Ramos heard sirens on West Capitol Avenue after Delgado and defendant returned to the apartment. Defendant took a tooth out of his hand and put the tooth in his wallet.[3] Delgado had a pack of Marlboro brand cigarettes. Delgado said he asked a guy for a cigarette, the guy "flipped out" and threw the cigarettes at Delgado, defendant hit the guy first, Delgado also hit the guy, and Delgado and defendant ran when they saw a passing truck. When Delgado spoke with Ramos he was in the living room and defendant was in the living room or at the kitchen table. Defendant said he punched the victim first and then "started socking him." After they heard the sirens, defendant said "they won't do nothing about it. They're just gonna get him and take him."

A recording of Ramos's January 2009 statement to police was also played to the jury. In that statement, Ramos said Delgado admitted he and defendant hit the victim and Delgado checked the victim for money but the victim did not have any.

B

We review a challenge to the admission of evidence pursuant to a hearsay exception under the deferential abuse of discretion standard of review. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Pirwani* (2004) 119 Cal.App.4th 770, 787.) A trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial

---

[3] The prosecution presented evidence that about a month after the assault, defendant had a one-inch scar on his left hand that was purportedly consistent with injuries that would have been sustained from punching Harpst.

7

court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Guerra, supra,* 37 Cal.4th at p. 1113; *People v. Brown* (2003) 31 Cal.4th 518, 540-541 [trial court's determination that preliminary facts exist to permit admission of a statement under an exception to the hearsay rule will not be disturbed if supported by substantial evidence].)

The adoptive admission exception to the hearsay rule is based on the proposition that the failure to deny an accusatory or incriminating statement under certain circumstances indicates a consciousness of guilt. (*People v. Briggs* (1962) 58 Cal.2d 385, 408.) Evidence Code section 1221 provides that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

"In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true." (*People v. Davis* (2005) 36 Cal.4th 510, 535.) " 'To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189-1190; 1 Witkin, California Evidence (5th ed. 2012) Hearsay, § 141, p. 981.)

The record supports the trial court's determination that there was sufficient evidence for the jury to conclude that defendant heard Delgado's statements to Ramos and Raya and adopted the statements as true. Raya lived in a small apartment. Ramos and Raya testified that defendant was in the living room or at the kitchen table and Delgado was in the living room when Delgado recounted what had happened. Raya's

kitchen and living room were not separated by a wall, and the kitchen table was very close to the living room. After Delgado implicated himself and defendant in the attack on Harpst, defendant did not disagree with Delgado's statements. Rather, according to Ramos, defendant admitted, consistent with Delgado's statements, that defendant punched Harpst first and then started "socking" him. Defendant's response shows that he understood and agreed with Delgado's statements about what had occurred on West Capitol Avenue.

Although Raya and Ramos gave contradictory accounts about defendant's location in the apartment during Delgado's narrative and whether Ramos and Raya were paying attention to defendant during Delgado's statements, it was up to the jury to decide what portion, if any, of their testimony to believe. (*United States v. Scheffer* (1998) 523 U.S. 303, 313 [140 L.Ed.2d 413, 421] [the jury determines the weight and credibility of witness testimony]; *People v. McKinnon* (2011) 52 Cal.4th 610, 676, fn. 40.) The trial court instructed the jury that if it concluded that someone made a statement outside of court that accused defendant of the crime or tended to connect defendant with the commission of the crime and defendant did not deny it, the jury must decide whether (1) the statement was made to defendant or made in his presence, (2) defendant heard and understood the statement, (3) defendant would, under all the circumstances, naturally have denied the statement if he thought that it was not true, and (4) defendant could have denied it but did not. The trial court also instructed the jury that if the jury decided that all of the above requirements had been proven, the jury may conclude that defendant admitted Delgado's statements were true; but if the jury decided the requirements had not been proven, the jury must not consider Delgado's statements or defendant's response to the statements for any purpose. We presume the jury followed the trial court's instruction. (*People v. Davis, supra,* 36 Cal.4th at p. 537.)

9

The jury could have concluded from the evidence presented that defendant heard Delgado's statements and adopted Delgado's statements as true. The trial court did not abuse its discretion in admitting the challenged evidence.

## II

Defendant next contends the trial court violated his Sixth Amendment right to confrontation when it admitted Ramos's statement to police that defendant and Delgado said the Red Nose Pittz gang was "about beating people up . . . ."

### A

Ramos told the police that Delgado and defendant said the Red Nose Pittz gang "was about beating people up who talk shit to them or who they see walking down the street." When Ramos subsequently testified that it was Delgado's father, not Delgado and defendant, who made the statement, defendant moved to strike the testimony based on hearsay. After listening to the recording of Ramos's police interview, the trial court denied defendant's motion to strike Ramos's testimony, concluding that the jury must decide whether Ramos received the information about the Red Nose Pittz from defendant and Delgado or from Delgado's father, given that Ramos provided contradictory statements concerning the source of her information.

### B

The Attorney General argues defendant forfeited his confrontation clause claim because he did not assert it at trial.

A party forfeits an objection to evidence unless he or she timely objects to the evidence and states the specific ground of the objection raised on appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 434-435.) Although defendant objected to Ramos's testimony on hearsay grounds only, at the hearing on in limine motions the trial court granted defendant's request that it deem a hearsay objection to include a Sixth Amendment confrontation clause objection. Thus, defendant did not forfeit his confrontation clause claim.

10

Alternatively, the Attorney General argues that although the trial court erred in admitting Ramos's statement to police, the error was harmless beyond a reasonable doubt in light of the other evidence against defendant. Reviewing defendant's confrontation clause claim de novo (*People v. Seijas* (2005) 36 Cal.4th 291, 304; *People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466), we conclude the trial court did not err.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right to confront those who "bear testimony" against him or her. (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 309 [174 L.Ed.2d 314, 320-321].) A witness's testimony against a defendant is inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity to cross-examine the witness. (*Ibid.*) When the witness appears at trial and is subject to cross-examination by the defendant, the confrontation clause places no constraints on the use of the witness's prior testimonial statements. (*Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 [158 L.Ed.2d 177, 197, fn. 9].)

Defendant's confrontation clause challenge lacks merit because Ramos testified at trial and was subjected to cross-examination by defendant, and because the out-of-court statement was not testimonial. Regarding Ramos, defendant "received what the confrontation clause requires: a full opportunity to confront and cross-examine" her. (*People v. Dement* (2011) 53 Cal.4th 1, 23-24.) Moreover, the out-of-court statement that Red Nose Pittz gang members are about beating people up was not testimonial because it was not a formal statement to a government officer and there was no reason to believe at the time that the conversation would be available for use at a later trial.

The confrontation clause addresses " 'the specific concern of "[a]n accuser who makes a formal statement to government officers" because that person "bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." [Citation.]' " (*People v. Loy* (2011) 52 Cal.4th 46, 66 [statement by the victim to a friend is not testimonial].) There is no evidence that defendant and Delgado or Delgado's father

11

made a "formal statement" to Ramos about what Red Nose Pittz gang members do. There is also no evidence that the statement responded to questions designed to prove some past fact for possible use in a criminal prosecution or that the challenged statement was made in the context of a conversation wherein Ramos acted in conjunction with law enforcement authorities to gather evidence. (*People v. Cage* (2007) 40 Cal.4th 965, 986-988 [statement in response to question by doctor, asked to provide medical treatment rather than to gather evidence for law enforcement authorities, was not testimonial]; *People v. Geier* (2007) 41 Cal.4th 555, 605 ["it is the 'involvement of government officers in the production of testimonial evidence' that implicates confrontation clause concerns"].) Additionally, there is no basis for concluding that the challenged statement was " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Crawford v. Washington, supra*, 541 U.S. at pp. 51-52 [158 L.Ed.2d at p. 193]; *People v. Jefferson* (2008) 158 Cal.App.4th 830, 835-836, 843 [statements not testimonial where defendants had no reason to believe their conversation would be available for use at a later trial because they thought their conversation was secret and they trusted each other to keep silent].) Nothing in the record shows that defendant, Delgado or Delgado's father could reasonably have believed that Ramos would share any of their confidences with the authorities. The out-of-court statement to Ramos does not bear the attributes of a "testimonial" statement within the meaning of *Crawford v. Washington, supra*, 541 U.S. 36 [158 L.Ed.2d 177].

Defendant also contends that Ramos's out-of-court reference to a statement by an unidentified police officer about Delgado's brother and that "they" had been "doing this for a few months now" is testimonial hearsay. But that claim is forfeited because defendant did not object at trial to the statement by the unidentified officer. (*People v. Partida, supra,* 37 Cal.4th at pp. 434-435; *People v. Burgener* (2003) 29 Cal.4th 833, 869

12

[objection based on federal right to confrontation is forfeited by failure to object on this ground at trial].)

                                                            III

Defendant further asserts that the trial court erred in admitting letters purportedly written by, or sent to, defendant when he was in custody at the Yolo County jail, because Bruce Naliboff, who testified about the letters, did not have sufficient knowledge about the mail collection and distribution procedures at the jail to authenticate the letters.

The trial court permitted Naliboff to testify about the content of five letters intercepted by jail personnel in 2009.  Among other things, the letters refer to the Red Nose Pittz, mention defendant's promotion of a person named Weddo to the position of "captain," include defendant's directions to the recipients about how to conduct themselves, and describe defendant as "a founder of our establishment."  Defendant claims the admission of the letters violated his right to a fair trial.

We review for abuse of discretion the trial court's finding that sufficient foundational facts were presented to authenticate the writings as letters by, or to, defendant.  (*People v. Smith* (2009) 179 Cal.App.4th 986, 1001.)

"Authentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).)  Authentication means "(a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.)  The trial court first determines whether there is sufficient evidence for the jury reasonably to find by a preponderance of the evidence that the writing is what the proponent claims it to be.  (Evid. Code, § 403, subd. (a); *People v. Marshall* (1996) 13 Cal.4th 799, 832-833.)  The preliminary fact of authentication is then subject to redetermination by the jury.  (*People v. Fonville* (1973) 35 Cal.App.3d 693, 708-709; 2 Witkin, Cal. Evidence (5th ed. 2012) Documentary Evidence, § 7, pp. 154-156.)  The determination whether sufficient facts have been presented to authenticate a writing is a

                                                            13

matter within the trial court's discretion. (*People v. Smith, supra,* 179 Cal.App.4th at p. 1001.)

A writing may be authenticated by circumstantial evidence, the content of the writing, or the location where the writing was obtained. (*People v. Smith, supra,* 179 Cal.App.4th at p. 1001.) In *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372-1373, sheets of rap lyrics were authenticated as writings by the defendant based on evidence that the lyrics were found in the defendant's bedroom, referred to the defendant's gang, and identified the composer with the defendant's gang moniker. In *People v. Gibson* (2001) 90 Cal.App.4th 371, 383, manuscripts were authenticated as the defendant's writings based on evidence that the manuscripts were seized from the defendant's home and hotel room, they referred to the author using defendant's alias, and they described a prostitution enterprise similar to the one operated by the defendant.

Here, Naliboff did not know the details of the mail collection and distribution process at the jail, other than the fact that mail was screened by jail personnel, and he could not say whether defendant actually wrote the letters attributed to him. Nonetheless, the content of the letters, and the manner in which they were obtained, were sufficient to authenticate them.

Naliboff was the chief investigator for the Yolo County District Attorney's Office. He asked jail personnel to forward to him correspondence sent by and to defendant. Sergeant Castaneda, the person in charge of security at the jail, forwarded the letters to Naliboff. The letters were intercepted at the jail where defendant was in custody, they were letters addressed to or from defendant at the jail, and the letters purportedly sent from defendant all appear to be in the same handwriting. There is no evidence that someone other than defendant would write or receive letters signed by or addressed to defendant at the jail.

Exhibit 39 is signed "LT," which witnesses identified as defendant's moniker. It is addressed to Joe Mandoriao, who appeared with defendant in a photograph presented at

14

trial without objection. The letter says defendant was "loyal to banga" and concludes "forever forward." The phrases "Loyal T. Banga" and "forever forward" also appear in exhibit 38. According to Naliboff, the salutation in exhibit 39 -- "Salutations and greetings to you, sir, with my utmost love, honor, respect, and loyalty, along with my utmost embracement" -- is typical of the salutation defendant used in his letters.

Exhibit 40 is a letter purportedly from Scott ("Luni") Delgado addressed to "LT."

Exhibit 41 is a letter addressed to Joe Mandoriao and signed "LT." The author provides his MySpace username, which contains the initials "LT." A letter to Luni (exhibit 38) instructs him to take pictures of "the pupps" with members of the "[P]ittz" and to tell "Weddo" that if there are "five different pupps, he is captain of his pupps and a step closer." Exhibit 37, a letter addressed to defendant and signed "Luni," appears to be a response to exhibit 38. It describes an order from "LT" to gather the "clique niggaz" and says the recipient should soon receive photographs the author took the day he received "LT's" letter. Additionally, exhibit 37 references "Weddo's" reaction to receiving a "rank up," the increase in rank referenced in exhibit 38. The attachment to exhibit 39, addressed to "Weddo" from "LT," also references "Weddo's" promotion to "captain."

Exhibits 37, 39 and 41 refer to defendant's gang, the Red Nose Pittz.

Based on the foregoing, there was sufficient circumstantial evidence that the challenged letters were written by or to defendant while he was housed at the jail. The trial court did not abuse its discretion in admitting the letters. Because we conclude there was no error, we do not address defendant's argument regarding prejudice.

15

IV

Defendant contends the trial court erred in instructing the jury that a person is "equally guilty" of a crime whether he or she committed it personally or acted as an aider and abettor.[4]

The prosecution argued that defendant was the direct perpetrator in the attempted murder count, but added that the jury could also find defendant guilty of attempted murder as an aider and abettor. Accordingly, the trial court instructed the jury on aider and abettor liability in accordance with CALCRIM Nos. 401 and 402 and the former version of CALCRIM No. 400, which provided in relevant part: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."

The Attorney General agrees that the "equally guilty" statement is erroneous and does not dispute defendant's claim that the error affected defendant's substantial rights. The Attorney General argues, however, that the error was harmless.

Defendant did not object to the CALCRIM No. 400 instruction in the trial court. Nonetheless, we will address the merits of his claim because the claim concerns an asserted misstatement of the law and a violation of his substantial rights. (§ 1259 [permitting appellate review of an instruction even in the absence of an objection below if the defendant's substantial rights were affected]; *People v. Moore* (2011) 51 Cal.4th 1104, 1130 [a claim that an instruction is not " 'correct in law' " may be raised on appeal

---

**4** In April 2010, CALCRIM No. 400 was revised to delete the word "equally" so that it now reads, "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400.) The trial court instructed the jury in defendant's second trial in October 2010, but used the former version of CALCRIM No. 400.

16

even in the absence of trial objection].) We conclude, however, that defendant has not established prejudice.

Defendant asserts the "equally guilty" statement in former CALCRIM No. 400 was incorrect because an aider and abettor and a direct perpetrator may have different mental states and may, therefore, be guilty of different crimes. But pursuant to CALCRIM No. 401, the trial court correctly instructed the jury on the requisite mental state for aiding and abetting liability. The trial court instructed that to prove defendant guilty of a crime based on aiding and abetting that crime, the prosecution must establish (1) the perpetrator committed the crime, (2) defendant knew that the perpetrator intended to commit the crime, (3) before or during the commission of the crime, defendant specifically intended to aid and abet the perpetrator in committing the crime, and (4) defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. The instruction properly explained the requisite mental state for an aider and abettor (*People v. Beeman* (1984) 35 Cal.3d 547, 560; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118) and we presume the jury understood and followed the trial court's instruction. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Moreover, even if the jury rejected the prosecution's theory that defendant was the direct perpetrator of the attempted murder, the prosecution convincingly proved its alternate theory that defendant aided and abetted Delgado in committing the crimes against Harpst. Raya testified that, according to Delgado, defendant and Delgado "fought" and robbed a man. Ramos told police that defendant had blood on his hands when he returned to Raya's apartment, and he removed a tooth from his fist. Ramos testified to the same at trial. She also said that defendant admitted attacking the man first and hitting him in the face and mouth. This testimony by Raya and Ramos showed that defendant took an active role in the attack against Harpst.

According to Eid, both attackers beat Harpst "pretty good," even while Harpst remained on the ground. After pausing as Eid stopped his truck, the attackers proceeded

17

to beat Harpst with greater force. The attacker standing over Harpst's head delivered rapid blows to Harpst's head and kicked Harpst, and the second attacker kicked and stomped on Harpst. Eid saw the attackers "swarming" around Harpst and "kind of took turns" hitting and kicking Harpst. Eid described the attack as "a good beating" and "savage." It appeared to Eid that both assailants "were having a good time." The beating inflicted by defendant and Delgado was so severe that Harpst suffered significant brain injury and multiple facial fractures, his eyes were swollen to the size of golf balls, blood was pouring from his mouth, ear and nose, and he lost a number of his teeth. The nature of the attack and the severity of the injuries demonstrate that even if defendant was not the assailant Eid saw delivering blows to Harpst's head and was, therefore, not directly responsible for the severe head injuries Harpst suffered, defendant is guilty of attempted murder on an aiding and abetting theory. Substantial evidence shows that defendant knowingly and intentionally assisted Delgado in the vicious attack on Harpst, and the assault was carried out in such a manner that a reasonable person in defendant's position would have foreseen that attempted murder was a natural and probable consequence of the assault with great bodily injury.

Moreover, defendant and Delgado were tried separately. The jury in this case was not asked to determine Delgado's criminal culpability and was not informed of the outcome of Delgado's trial. Instead, the trial court instructed the jury: "The evidence shows that other persons may have been involved in the commission of the crimes charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate as to whether those other persons have been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crimes charged." Nothing in the record indicates that the jury believed defendant's culpability was necessarily tied to Delgado's.

18

To the extent defendant argues that absent the "equally guilty" instruction the jury might have convicted him of manslaughter based on the imperfect defense of another or heat of passion theory, we disagree.

Imperfect defense of another requires a finding that the defendant, fearful of immediate and present danger to life or great bodily injury, actually believed in the immediate need for defense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Rogers* (2006) 39 Cal.4th 826, 882-884 [instruction on imperfect-self-defense theory unwarranted where there was no substantial evidence that the defendant believed he needed to defend himself from death or great bodily injury when the victim pointed her finger at him].) There is no evidence that Harpst posed an imminent threat of death or great bodily injury to defendant or Delgado, or that defendant actually feared imminent death or great bodily injury. Ramos testified that defendant reportedly thought Harpst would hit, not kill or inflict great bodily injury upon, Delgado. There was no other evidence of defendant's belief in the need to defend Delgado. Harpst was unarmed and Eid never saw Harpst fight with his attackers. When Eid first came upon the scene of the attack, Harpst was on his feet and Delgado and defendant were "swinging" on Harpst, but within seconds, Harpst was on his back and unmoving in the middle of West Capitol Avenue. Delgado and defendant continued hitting and kicking Harpst while Harpst remained on the ground. Delgado and defendant stopped their attack on Harpst only when Eid stopped his truck in front of them. Delgado and defendant left Harpst unconscious and severely injured. Under these circumstances, the jury reasonably rejected defendant's imperfect defense of another claim. (*People v. Hardin* (2000) 85 Cal.App.4th 625, 634, fn. 7 [once the victim had been disarmed and the defendant straddled her while she lay on the floor, the defendant, who relied on imperfect self-defense, "could no longer entertain the belief that [the victim] constituted an *imminent* and *deadly* peril to him"]; *People v. Uriarte* (1990) 223 Cal.App.3d 192, 197-198

19

[imperfect defense of another instruction unwarranted where, among other things, the defendant continued to shoot after the victim was incapacitated].)

Moreover, to find heat of passion for purposes of reducing murder to manslaughter, the defendant's reason must have been " 'actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment' " ' " and the victim must cause the provocation. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) There is no evidence that Harpst said anything to, actually laid hands upon, or did anything to threaten Delgado or defendant. Harpst may have thrown cigarettes at Delgado, but the jury could not have reasonably concluded that throwing cigarettes at Delgado was sufficient to provoke an ordinarily reasonable person to engage in homicidal conduct in a fit of passion.

The evidence also suggests that the continuation of the attack was not due to heat of passion. (*People v. Moye* (2009) 47 Cal.4th 537, 549-550 [heat of passion requires proof that the defendant acted while under " 'the actual influence of a strong passion' " induced by provocation].) According to Ramos, Delgado said he and defendant stopped beating Harpst but defendant went back and hit Harpst some more. Eid observed that Harpst's attackers stopped their attack on Harpst when Eid passed them in his truck, but after Eid's truck moved on the attackers proceeded to beat Harpst with greater force. As the Supreme Court has observed, " ' " '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " ' " (*People v. Manriquez, supra,* 37 Cal.4th at p. 577.) The pause in the attack on Harpst and the apparent decision to resume hitting and kicking him with greater vigor was substantial evidence of deliberation. And as we discuss in part V, the testimony by the prosecution's gang expert, Officer Michael Duggins, further suggests that the violent attack by Delgado

20

and defendant, both Norteño gang members, was motivated not by heat of passion but instead by a desire to gain respect for themselves and their gang and to instill fear in the community. The jury necessarily rejected defendant's heat of passion argument by finding true the allegation that the attempted murder was willful and done with deliberation and premeditation.

Accordingly, defendant's CALCRIM No. 400 contention lacks merit.

V

Defendant claims there is insufficient evidence that he committed the offenses to benefit a criminal street gang.

On a claim of insufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) We do not reweigh evidence or reevaluate the credibility of witnesses. (*Ibid.*)

Expert opinion can be sufficient to support a section 186.22, subdivision (b)(1) enhancement (*Albillar, supra*, 51 Cal.4th at p. 63) because the subject matter of the culture and habits of criminal street gangs is sufficiently beyond common experience that expert testimony would assist the jury. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.) As one appellate court observed, " '[i]t is difficult to imagine a clearer need for expert explication than that presented by a subculture in which . . . mindless retaliation promotes "respect." ' [Citations.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1049, fn. 5.) Hence, an expert may testify, in response to a hypothetical based on facts shown by the evidence,

21

about whether a particular crime was committed for a gang purpose. (*People v. Gardeley, supra,* 14 Cal.4th at p. 619; *People v. Vang, supra,* 52 Cal.4th at pp. 1041, 1043; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1505-1506, 1512-1514.)

Here, the jury found true the enhancement allegations that defendant committed attempted murder, mayhem, attempted robbery, and assault by means of force likely to produce great bodily injury for the benefit of, at the direction of or in association with a criminal street gang with the specific intent to promote, further or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1) ("section 186.22(b)(1)").[5] And expert testimony, coupled with the other evidence presented, was sufficient to support the gang enhancement findings.

The prosecution's gang expert, Officer Duggins, opined that defendant and Delgado were active Norteño gang members in January 2009. Defendant admitted to West Sacramento law enforcement authorities in 2008 that he was a Norteño gang member and Delgado also admitted that he was a Norteño gang member. Defendant does not dispute on appeal that the Norteño gang is a "criminal street gang" within the meaning of section 186.22, subdivision (f) and that he and Delgado were active participants in the Norteño street gang in January 2009.

Duggins further opined, in response to a hypothetical, that two active Norteño gang members who viciously assault a victim on West Capitol Avenue and take cigarettes from the victim by force or fear would have acted with the intent to promote and further the criminal activities of Norteño gang members and their actions would have benefitted the gang. Duggins explained that the location of the hypothetical assault was significant because West Sacramento had an active Norteño gang presence and Norteño

---

[5] Although section 186.22 has been amended since 2009, the language contained in section 186.22(b)(1) is unchanged. (Stats. 2009, ch. 171, § 2; Stats. 2010, ch. 256, §§ 1, 2; Stats. 2011, ch. 361, § 2.)

gang members gain status and respect for themselves and their gang by committing violent crimes in their neighborhoods. Delgado lived within blocks of where the attack on Harpst occurred, and the jury was shown photographs of graffiti associated with the Norteño street gang, the Red Nose Pittz and defendant's moniker "LT" on a fence behind Delgado's apartment complex.

Duggins told the jury the Norteño street gang's primary activities were assaults with a deadly weapon or causing great bodily injury, robberies, car theft, attempted murder, drug sales and burglaries. He testified about a 2006 felony robbery and a 2007 vicious assault committed by Norteño gang members acting together. He explained that Norteño gang members committed violent crimes in groups of two or more to gain respect from the community, from fellow Norteños and from rival gangs. Norteño gang members did this by means of force, fear and intimidation to benefit the gang. In Duggins's view, the hypothetical attack would not only enhance the assailants' status within the gang but also benefit the whole gang. Duggins elaborated on how the hypothetical assault would benefit the Norteño street gang: "Everybody hears about this crime, and when Norteños do it in association with each other, people know that they live in that neighborhood. [¶] . . . [¶] It lets everybody know, both rival gang members and ordinary citizens, that these gang members aren't afraid to do stuff like this. They're not afraid to assault people for something even so insignificant as cigarettes, and they're willing to go to that extreme to gain that reputation and that fear from society, individuals. [¶] . . . [¶] [W]hen word gets around that gang members will do this, witnesses hesitate to come forward, sometimes even victims won't come forward. We've heard testimony that sometimes people won't even stop when they see this going on. So it allows them to continue doing this type of thing unimpeded by not only citizens, but it helps law enforcement not get involved too which helps them just keep doing these crimes over and over again." Duggins also told the jury that when members of one Norteño subset go into a neighborhood claimed by members of a different Norteño

23

subset, they are more apt to engage in criminal activity "to show their allegiance to the Norteños, to show they're willing to put in this type of work for the gang." Duggins's testimony adequately explained the connection between the gang and the defendants' crimes. (*Albillar, supra*, 51 Cal.4th at pp. 53-54, 63; *People v. Williams* (2009) 170 Cal.App.4th 587, 625; *People v. Vazquez* (2009) 178 Cal.App.4th 347, 351, 353.)

According to Duggins, when gang members commit crimes together they build bonds and give each other "strength" and "motivation." Moreover, gang members are expected to help each other and when a gang member does not participate in a crime, he will "be held responsible."

Defendant contends there was no evidence that Delgado and defendant planned to further their gang's position in the community or enhance their own status in the gang when they left Raya's apartment. But even if Delgado and defendant did not discuss committing a crime when they were at Raya's apartment, Ramos knew something bad would happen because defendant and Delgado left the apartment together and Ramos was familiar with the activities of defendant's gang. Duggins testified that active Norteño gang members live "that lifestyle all the time. So when they're out on the street at 3:15 in the morning, they are Norteño criminal street gang members . . . and they act as Norteño criminal street gang members." Defendant and Delgado told Ramos that their gang was about beating people up who "talk shit to them" or who they see walking down the street, and defendant and Delgado had "done this before." What happened to Harpst was consistent with the testimony by Duggins and Ramos regarding the violent crimes committed by Norteño and Red Nose Pittz gang members.

Defendant argues there is no evidence that he or Delgado attempted to inform the Norteños about the attack; instead, they sought to avoid detection by police. But according to Ramos, defendant was proud of the tooth that was embedded in his hand as a result of the assault, apparently keeping the tooth as a trophy. Delgado and defendant talked to Ramos about what they did. Days after the assault on Harpst, Ramos told police

24

she heard a lot of stories about the incident. She also described a conversation she had with a friend relating to the attack. Raya initially did not want to help police because she did not want to be labeled a snitch and she worried about her safety and the safety of her baby. Raya's concerns supported Duggins's opinion that violent crimes by Norteño gang members in West Sacramento made witnesses fearful of coming forward, thereby helping the gang's criminal activities.

The jury could reasonably infer from the evidence presented that defendant, in concert with Delgado, acted for the benefit of a criminal street gang and that defendant intended to further or assist criminal conduct by a fellow gang member.

## DISPOSITION

The judgment is affirmed.

        MAURO        , J.

We concur:

      RAYE      , P. J.

      NICHOLSON    , J.