Filed 11/14/14  P. v Hamilton CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B250543 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA065186) |
| v. | |
| IAN HAMILTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael K. Kellogg, Judge.  Affirmed.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Erika D. Jackson, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Ian Hamilton of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the allegation that a principal was armed with a firearm during commission of the murder (§ 12022, subd. (a)(1)). The trial court sentenced defendant to 26-years-to-life, comprised of 25-years-to-life for the murder count and a consecutive 1-year term for the firearm enhancement.

Defendant contends the trial court erred in admitting testimony regarding information contained in a cell phone, failing to properly instruct the jury on accomplice testimony, and improperly instructing the jury regarding the consideration of an immunized witness's testimony. Defendant also contends that trial counsel rendered ineffective assistance by failing to request a limiting instruction with respect to witnesses' guilty pleas, and that cumulative error deprived him of a fair trial.

We affirm the judgment.

# FACTS

**Prosecution**

*Planning of the Murder and Prior Attempts*

Angel Nieto and defendant worked together as security guards at the Promenade Mall before Nieto left to work at another mall. Defendant was Nieto's supervisor. Gary Mikaelian also worked at the mall, as defendant's supervisor.

Defendant had a son with Anel Juarez. They were engaged in an ongoing custody battle over their son, which angered defendant. Defendant was unhappy with the way Juarez cared for their son, and also was upset because she was stripping at private parties. Defendant told Nieto and Mikaelian about the problems he was having with Juarez.

---

[1] All further statutory references will be to the Penal Code, unless otherwise specified.

Nieto saw defendant arguing on the phone with Juarez. Defendant used one phone to call Juarez, and had a second phone to call everyone else.

Defendant initially offered Nieto $300 to "fuck [Juarez] up." Nieto refused, but said he knew someone who would do it and discussed it with his friends Efren and Fabian. In exchange, Nieto would pay Efren and Fabian with marijuana. Defendant paid Nieto $300 and instructed Nieto, Efren, and Fabian to go to a laundromat near defendant's house to hurt Juarez. There were too many people at the laundromat, so the plan was called off.

There were several occasions on which defendant instructed Nieto to go to a specific location to wait for Juarez and beat her up. Nieto took different people with him each time, including Efren, Fabian, and another friend, Gerson Herrera. Defendant once told Nieto that Juarez had about $800 they could take from her. Each time, Juarez did not show up at the specified location, so the men abandoned the plan.

After the failed attempts to harm Juarez, defendant told Nieto that he wanted to "get rid of" her, which Nieto took to mean that he wanted Juarez killed. Nieto refused, but said he would ask Herrera. Nieto had borrowed a .45 caliber gun from defendant because he was having trouble with his neighbor, who he believed to be dangerous. Herrera saw the gun, and said he liked it. He said he would kill Juarez if defendant would give him the gun. Defendant did not know Herrera, so Nieto introduced them. Defendant agreed to give Herrera the gun if he would kill Juarez. Herrera asked how many shots he should fire at Juarez because he might "get trigger-happy." Defendant said that he did not care and "just to empty the whole [magazine]."

Sometime later, defendant told Nieto and Herrera to meet at a gas station. Mikaelian met them there and gave Herrera the gun. Nieto followed Mikaelian to Juarez's apartment in his car. Defendant wanted Nieto to drive by and shoot Juarez when he brought her out of the apartment building, but Nieto refused because he did not want to be seen. Instead, Nieto and Herrera waited at the side of the building. Herrera was supposed to shoot Juarez when she came out. Eventually defendant came out of the apartment building. Juarez never came out, so Nieto and Herrera left.

3

Defendant called Nieto several times later, directing him to execute the plan to kill Juarez. Each attempt was abandoned due to logistical difficulties.

Later, defendant called and sent text messages to Nieto asking that Herrera return the gun to him because defendant needed it. Nieto told Herrera to return the gun and that he could have it back later. Nieto gave defendant the gun.

On April 12, 2010, defendant texted Nieto that "he had something for his boy." Nieto understood this to mean that defendant had bullets to give to Herrera. He also asked Nieto to tell Herrera that he would need the gun back before he took back his son.

### *The Murder*

On April 13, 2010, between 7:00 p.m. and 7:30 p.m., defendant called Mikaelian and asked him to come to the mall where they worked because he needed money to buy gas for the truck. Mikaelian arrived and gave defendant money. Although defendant was scheduled to work from 3:30 p.m. to 11:00 p.m., Mikaelian drove defendant to Nieto's apartment. Nieto was not home. After waiting about 20 minutes, defendant and Mikaelian went to Juarez's apartment.

As they were driving to Juarez's apartment at around 8:40 p.m. to 9:00 p.m., Nieto called Mikaelian's phone and asked to speak with defendant. When they arrived at the apartment, defendant told Mikaelian that he was taking Juarez to a job. He asked Mikaelian to drive to the job location and wait for him. Defendant planned to leave with Mikaelian. Mikaelian drove to the location and parked.

Nieto was at work at around 8:30 p.m. when he received a phone call from defendant, who told him to look for Herrera. Defendant wanted to give Herrera a Glock .45 caliber handgun. They had previously devised a plan to kill Juarez. Defendant was going to bring Juarez to the location under the pretense of driving her to a stripping job he had gotten her, and Herrera would shoot her in her car. Afterwards, Nieto would drive Herrera away. Defendant, Nieto, and Herrera had scouted the location the day before. It

4

was in a dark area near Whitsett Park where there were not a lot of people. Defendant would call when it was time.

Nieto went home to change his clothes and then went to Herrera's house. Defendant had already given Herrera the gun and a box of bullets. Joaquin Ramos, another friend of Nieto's, was also at Herrera's house, and said that he would leave his dad's van window open so that they could drop the gun into the van after using it. Nieto changed his mind about driving Herrera, but Ramos said he had to do it, because he set the whole thing up. Nieto left to get high before driving Herrera to Whitsett Park.

Saida Navarrete lived in an apartment on the first floor of the apartment building where Juarez resided. At around 9:00 p.m., Navarrete and her husband were walking out of the apartment complex when she saw Juarez walking down the stairs with defendant. Navarrete had seen defendant come to the apartment complex on two occasions. Juarez appeared to be intoxicated or under the influence of drugs. Defendant was holding Juarez as she walked. Defendant was silent and did not make eye contact. His demeanor was odd, and he held Juarez as if he was trying to prevent her from talking to anyone. Juarez and Navarrete greeted each other, but defendant made an abrupt turn and took Juarez away so that she could not continue to speak to Navarrete. Navarette had babysat for Juarez on a prior occasion, and Juarez told her if her son's father came not to let him take the child and to call the police.

Nieto drove Herrera to Whitsett Park around 9:00 p.m. Nieto saw Juarez's black Honda arrive containing two occupants. The Honda parked across the street from Nieto. Defendant got out of the Honda and started walking away.

Mikaelian also saw the Honda arrive. It was parked on the side of the street where his car was parked. Defendant came over to Mikaelian's car, said everything was fine, and told him, "Let's go."

At the same time, Herrera walked toward the Honda with the .45 caliber handgun that Nieto recognized as a gun defendant had previously brought to work. Herrera came back to the car and told Nieto he was not going to kill Juarez because there were too

many people around.  Nieto called defendant.  Defendant said Herrera had to do it that night.

Nieto drove around the corner to try a different approach.  Herrera exited the car and walked toward Juarez's car, but returned because there were too many people on a balcony nearby.  Nieto called defendant again and told him that there were too many people around.  Defendant said that he was returning to the park area and that the murder had to take place that day.  He also said to block Juarez's car if she tried to leave.

While they were in the car, defendant received a call on a phone that Mikaelian did not recognize.  After defendant hung up the phone, he asked Mikaelian to return to the place where they left Juarez.  Mikaelian returned to the same spot where he had parked earlier.  Defendant exited the car and walked over to Juarez.  A minute later, defendant returned to Mikaelian's car and told him that they were in the wrong place, and to follow Juarez's car.  Defendant walked back and entered Juarez's car.

Defendant called Nieto and said he was going to follow Nieto to a new location.  Juarez's car turned to follow Nieto's.  Nieto and Herrera discussed where they should go.  They passed Mikaelian's parked car as they were driving.  Nieto parked on a dead end street.  Juarez and Mikaelian followed him.

Defendant called Nieto again and asked where Herrera was.  Nieto said he was in the car next to him.  Defendant said to tell Herrera to come to Juarez's car.  Herrera got out of the car with the loaded .45 caliber handgun and walked toward Juarez's car.  He passed defendant on the way to the car.  After about 20-30 seconds, Nieto heard three shots fired.  Mikaelian heard them as well.  Defendant ran and got into Mikaelian's car and said "Let's go."  Mikaelian drove away.

Mikaelian asked what happened, and defendant responded that he would tell him later.  Mikaelian dropped defendant off at the mall around 10:00 p.m. or 10:30 p.m.

Herrera ran to Nieto's car.  Nieto drove away slowly.  Nieto noticed a "burnt" smell after Herrera entered the car, a smell similar to one he recalled from going to a shooting range with defendant.  Nieto drove to Ramos's apartment where Ramos had parked the van.  He saw Mikaelian's car pass by.  Herrera exited the car and dropped the

6

handgun through the van's window. He returned to the car and Nieto drove away. Nieto dropped Herrera off at his house and then went home.

Aleen Haroian lived on the street where the murder took place. She was at home that night. At around 10:00 p.m. she heard her dog aggressively and continuously barking along the side of her house. The dog's behavior caused Haroian to believe that there was something unusual happening outside. She went outside and saw a Hispanic man pacing back and forth on the sidewalk in front of her home. A black car that Haroian did not recognize was parked across the street from the house. The man placed his hand on his right pocket. Haroian pulled her mother, who had been outside, into the house quickly. She was going to call her father when she heard two gunshots. Haroian called 9–1–1.

The morning after the shooting, Nieto went to Herrera's house. Ramos was also there. Herrera was cleaning the .45 caliber handgun used in the shooting. Ramos told Nieto not to talk about the murder. After Ramos left, Herrera told Nieto what had happened the night before. Herrera stated that he walked up to Juarez's car and Juarez asked him if he was defendant's "homie." Herrera shook his head to indicate "no," and then he shot Juarez. Juarez had a surprised look and let out a gasp when Herrera displayed the gun.


### *The Investigation*


Los Angeles Police Department Officer Gary Pugliese, Detective Timothy Kirkpatrick, and Detective Mark O'Donnell investigated the murder. Juarez was found dead at the scene, in the driver's seat of her car. It was determined that she died as a result of multiple gunshot wounds. Three .45 caliber casings were found at the scene of the shooting. A restraining order against defendant and pieces of paper with defendant's name and phone numbers on them were discovered inside Juarez's car.

The next morning, police obtained defendant's time sheet from Mikaelian at the mall. Detective O'Donnell went to defendant's house at around 7:00 a.m. or 8:00 a.m.

He told defendant he was investigating Juarez, and asked if defendant would come to the station voluntarily. Defendant agreed.

Defendant spoke with police about his relationship with Juarez, their child custody arrangements, and several restraining orders she had against him for physical violence. He said that he was working at the mall from 3:00 p.m. to 11:00 p.m. the night before. He last spoke to Juarez at around 3:00 p.m. the previous day. They had exchanged several texts during the week because Juarez was having trouble with her roommate, and defendant was helping her with the situation. He denied involvement in the murder, and consented to a search of his home and car. No weapons were found in the search.

Defendant was arrested on May 26, 2010. His home was searched again. Three different cell phones were discovered, along with shotgun shells, .380 caliber ammunition, and packaging for .40 caliber ammunition.

Mikaelian and Nieto both spoke with police on several occasions. They lied or left out information about the murder during several of their respective interviews. Both men were arrested in connection with the murder on May 26, 2010.

Ramos's house was searched in January 2012. A .40 caliber Beretta, a .44 caliber revolver, a .45 caliber Colt handgun, a shotgun, and ammunition were found. Ramos was arrested. The .45 caliber casings found at the murder scene were not fired from the .45 caliber Colt.

Detective O'Donnell interviewed Juarez's son, Johnny Hernandez. He had seen guns in defendant's house and had accompanied him to the shooting range. He kept the shells, and turned them over to Detective O'Donnell after the interview. The shells were fired from the .40 caliber gun found at Ramos's house.

Hernandez was staying at Juarez's house about five months before her death. Juarez received between 50 and 60 calls from defendant in a half hour, which appeared to distress her. The calls were short, angry, and unpleasant. Juarez hung up, but then agreed to let defendant come over. Defendant acted in a controlling manner and took Juarez outside for a 10 minute walk. When they came back, defendant acted normally,

8

but Juarez appeared sad and closed off. According to Hernandez, defendant and Juarez had a custody hearing scheduled for May 27, 2010.

The police searched Juarez's apartment, which appeared to be undisturbed. Detective O'Donnell discovered a cell phone in the pocket of a sweater in Juarez's closet that contained an entry entitled "Ian cell cell" with the phone number (818) 554-3252, and a second entry entitled "Ian?" with the phone number (818) 903-2002. The detective was unable to locate any of the texts that defendant mentioned sending to Juarez earlier in the week.

Navarette approached the police while they were searching Juarez's apartment. Police showed her a photo of defendant, which she identified as being the person she had seen with Juarez the night before.

Detective O'Donnell obtained a court order for the subscriber information and call detail information for defendant's cell phone, (818) 903-2002, for April 12, 2010, through April 14, 2010. He also obtained the location of the cell towers used for the calls made and received by the number. All calls made between 3:00 p.m. and 5:00 p.m. on April 13, 2010, were made within a mile of a cell tower near the Promenade Mall. A call at 8:50 p.m. was serviced by a cell tower 1.8 miles from Juarez's residence. The next activity was a call placed at 10:28 p.m. which was serviced by a cell tower near the Promenade Mall.

There were several numbers that appeared repeatedly reflecting calls to and from defendant's phone. Between April 12, 2010, and April 14, 2010, defendant's phone was used to call Juarez's number 51 times. Each call was preceded by *67, to block the calling number. There were 17 calls made between defendant's phone and Mikaelian's on April 13, 2010, between 9:37 a.m. and 7:54 p.m. There were 11 calls made between defendant's phone and Nieto's phone on April 13, 2010, between 9:41 a.m. and 8:49 p.m. Also on April 13, 2010, two calls were made to Herrera's phone before 6:56 p.m.

Detective O'Donnell obtained court orders for the records for Herrera and Nieto's phones. The records reflected 10 calls between Nieto's phone and defendant's phone between 9:41 p.m. and 10:11 p.m. on April 13, 2010.

9

Detective O'Donnell also obtained a court order for the records of the (818) 554-3252 number listed in Juarez's phone. The phone was a "pay-as-you-go" phone – minutes were pre-paid prior to usage – and was registered to "Bart Henry." It was activated on April 10, 2010, and deactivated on April 14, 2010. The records showed 11 calls between the number and Nieto's phone between 7:50 p.m. and 10:11 p.m. on April 13, 2010. There were also 11 calls between the number and Herrera's number between 6:57 p.m. and 10:12 p.m. on April 13, 2010. There were 12 calls to Juarez's phone. The last was at 8:59 p.m. on April 13, 2010. There were no calls to or from Mikaelian's phone or to or from defendant's phone. All the calls placed on the phone on April 13, 2010, between 8:00 p.m. and 10:12 p.m. used cell towers near the Promenade Mall, Juarez's residence, or the murder location.

Agent David Magnuson, a member of the Cellular Analysis Survey Team with the Federal Bureau of Investigation reviewed the cell records for defendant's phone and the (818) 554-3252 number from April 13, 2010, to April 15, 2010. Agent Magnuson mapped the location of the cell towers utilized during calls to and from the cell phones. Agent Magnuson also indicated the cell phone attached to the (818) 554-3252 number was a "pay as you go" phone. Very little information is required to activate this kind of phone.

The records for (818) 554-3252 reflected a call at 6:03 p.m. to Juarez's cell phone which used the cell tower near the Promenade Mall. Subsequent calls were made to her and Herrera from 6:04 p.m. to 7:15 p.m. using the same tower. Later calls were made to and from Herrera, Nieto, and Juarez between 7:43 p.m. and 8:07 p.m. The cell towers those calls utilized indicated the phone was traveling east on the 101 freeway. There were calls placed to and from Herrera at 8:24 p.m. and before 8:33 p.m. that used the cell tower nearest to the murder location. The next calls were placed to Herrera between 8:33 p.m. and 8:38 p.m., and the cell towers used indicated the phone was traveling south. A call was placed to Juarez's phone at 8:59 p.m. utilizing the cell tower closest to her residence. Another call was placed at 9:17 p.m. using the same tower. Several calls were

10

made to and from Nieto's phone between 9:40 p.m. and 9:56 p.m. At 10:00 p.m., a call was placed to Nieto's phone using a cell tower located near the murder location.

Detective O'Donnell also reviewed the mall's security footage for the night of the murder. He saw defendant's truck in the parking lot. Defendant was also visible on the video between 3:00 p.m. and 7:00 p.m., but did not appear between 7:00 p.m. and 10:35 p.m.

**Defense**

Defendant presented several character witnesses who had known him for a significant period of time. None of them believed that defendant would murder Juarez. Their relationship appeared normal and loving. One witness had seen a videotape where Juarez was the aggressor.

**Rebuttal**

Juarez's sister, Arlette Juarez, testified that when she and Juarez lived together, defendant had thrown a glass table, putting a hole in the wall. Another time, Juarez had shown her holes in the wall and bruises on her chest. Arlette and her husband argued frequently. Defendant told her if she had issues with her husband, he could "take care of it." When she was not living with Arlette, Juarez did not visit often because defendant would not let her go out. Juarez tried to leave defendant several times by going to Arlette's house. Arlette was afraid of defendant because he hurt her sister. She said defendant only cared about their son.

Another of Juarez's sisters, Jeanette Heygood, testified that defendant was manipulative, controlling and disrespectful. She believed that defendant was capable of violence and would hurt Juarez. She could not persuade Juarez to leave defendant.

11

## DISCUSSION

### Cell Phone Display Testimony

Detective O'Donnell testified that he examined a cell phone recovered from the pocket of a sweater found during a search of Juarez's apartment. At that point in the testimony, defense counsel requested a sidebar conference to make a hearsay objection. The trial court excused the jury for the morning and conducted a hearing on the objection.

Defense counsel expressed concern that Detective O'Donnell would testify the cell phone contained an entry entitled "Ian cell cell." He argued that someone associated the phone number with a person named Ian and manually typed the number into the phone, which was assertive conduct, and comparable to making a statement. Further, the testimony would be admitted to prove the truth of the matter asserted – that the phone belonged to defendant, which was impermissible hearsay. Absent the cell phone display evidence, the phone could not be connected to defendant.

The prosecutor countered that *People v. Fields* (1988) 61 Cal.App.4th 1063, held that phone numbers and names typed into a cell phone or pager were non-assertive conduct and therefore not hearsay. Defense counsel replied that the number itself would not be assertive conduct, but that the name associated with the number could easily be manipulated. If a name that was entered into the phone was not hearsay, nothing typed into the phone would be considered hearsay.

The trial court overruled the objection and court recessed for the morning. Following the recess, the trial court held another hearing out of the presence of the jury to give the parties further support and explanation for its ruling. The court discussed two recent cases, *People v. Dungo* (2012) 55 Cal.4th 608, and *People v. Ellis* (2013) 213 Cal.App.4th 1551,[2] and concluded that the name displayed on the cell phone was not

---

[2] Review was granted in *People v. Ellis* on June 12, 2013 (No. S209408), so it is no longer citable.

12

hearsay because "only people can generate hearsay," and the display could not be manipulated and did not have "inherent bias." The court further stated that there was a hearsay exception for admission of a cell phone display: "When you get into the issue of whether or not a phone has been used in communication, the phone itself, there is an alternative theory, instrumentality of the crime. Instrumentality of the crime would be that it was used during and contemplated before the use and during a conspiracy, therefore that . . . exception would apply." The trial court overruled the objection again, over defense counsel's protest.

Detective O'Donnell testified that he inspected the cell phone found in the closet and found the entries "Ian?" and "Ian cell cell" in the contacts. The number associated with the "Ian?" entry was (818) 903-2002, and the number associated with the "Ian cell cell" entry was (818) 554-3252.

Later, the prosecutor questioned Nieto concerning the (818) 554-3252 number, which he referred to as the "secret" phone:

"[Prosecutor:] Now I want to direct your attention to the date of April 13, 2010. There is a phone call at 7:51 p.m. originating from 554-3252. [¶] 7:51 p.m., who is that call from?

"[Nieto:] Hamilton.

"[Prosecutor:] And was that the first time you ever got a phone call from that phone number?

"[Nieto:] Yes.

"[Prosecutor:] And how did you know it was Hamilton?

"[Nieto:] Well, I picked it up, it was him."

The prosecutor did not refer to Detective O'Donnell's testimony to establish the connection between defendant and the (818) 554-3252 number in his closing argument. He instead appealed to the juror's "common sense" to make the connection, given other circumstances evidenced in the trial, such as the fact that calls were made from the area of the murder on the night and time it occurred, and the fact that most of the other people involved in the murder had been called from the (818) 554-3252 number.

13

Defendant contends that the trial court erred in its ruling. We disagree. "'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is *offered to prove the truth of the matter stated*." (Evid. Code, § 1200, subd. (a), emphasis added.) An out-of-court statement may be admissible for a nonhearsay purpose if the trial court finds the nonhearsay purpose relevant to an issue in dispute. (*People v. Smith* (2009) 179 Cal.App.4th 986, 1004.)

Although the reasoning of the trial court is not entirely clear, its ultimate conclusion that the cell phone display was not hearsay was correct. The information on the cell phone display was relevant to the issue of whether the phone associated with the (818) 554-3252 number was used in commission of the murder. Evidence of defendant's name and phone number on the phone from Juarez's apartment was not offered to prove the that the number belonged to defendant. Instead, the relevance of the number was that it was used to effectuate the perpetration of the murder. This fact was independently proven through both direct and circumstantial evidence. Nieto provided the direct evidence by testifying that defendant called him from the phone number on April 13, 2010, shortly prior to the murder of Juarez. Circumstantial evidence of defendant's use of the phone is found in the records showing calls made utilizing cell towers in the vicinity of defendant's location in the time leading up to the murder.

The information displayed on Juarez's phone is therefore merely circumstantial evidence the phone was used in connection with murder, and corroborates Nieto's testimony that defendant called on that phone number, regardless of whether that number belonged to defendant. The prosecution did not argue Detective O'Donnell's testimony connected defendant to the (818) 554-3252 phone number in closing argument, nor was it necessary to do so to establish the connection between defendant and the number. The testimony concerning the cell phone display was not offered for its truth. It was properly admitted for a nonhearsay purpose.

While we are satisfied the information displayed on the phone recovered from Juarez's apartment was not inadmissible hearsay, there is no doubt that introduction of that evidence could not have been prejudicial in this case. Nieto testified to receiving a

14

call from defendant on the (818) 554-3252 phone number. Phone records corroborated Nieto's testimony. No contrary testimony was offered or even suggested. Error, if any, was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

**Instructions on Accomplice Testimony**

Nieto and Mikaelian were charged with Juarez's murder. Both pled guilty to voluntary manslaughter and attempted murder and agreed to provide truthful testimony for the prosecution at trial. Nieto agreed to a sentence of 13 years and 4 months in state prison in exchange for his truthful testimony. Mikaelian agreed to a sentence of 8 years and 4 months for testifying truthfully. Both testified about their plea bargains and the benefits they would receive.

Defendant contends that the trial court had a sua sponte duty to instruct the jury to view the testimony of Nieto and Mikaelian with caution pursuant to CALJIC No. 3.18. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) CALJIC No. 3.18 provides as follows: "To the extent that [an accomplice] [or] [a codefendant] gives testimony that tends to incriminate [the] . . . defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in this case."

We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "'"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]"' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.) "Error in failing to instruct the jury on consideration of accomplice testimony at the guilt phase of a trial constitutes state-law

15

error, and a reviewing court must evaluate whether it is reasonably probable that such error affected the verdict." (*People v. Williams* (2010) 49 Cal.4th 405, 456.)

The trial court erred in failing to instruct the jury with CALJIC No. 3.18, but the error was harmless. The jury was thoroughly instructed on the requirement of corroboration for accomplice testimony. (See CALJIC Nos. 3.11, 3.12, 3.13.) "At common law the fact that a witness was an accomplice resulted only in an instruction that his testimony was to be viewed with care, caution, and suspicion unless corroborated in any material matter by independent evidence. [Citations.] The limitation based on the common law distrust of accomplices as now embodied in [Penal Code] section 1111 [barring convictions based on uncorroborated accomplice testimony] is much harsher than the common law limitation. Juries are now compelled rather than cautioned to view an accomplice's testimony with distrust, for while his testimony is always admissible and in some respects competent to establish certain facts (see *People v. McRae* [(1947)] 31 Cal.2d 184, 187 [probable cause to hold defendant to answer at preliminary hearing]), such testimony has been legislatively determined never to be sufficiently trustworthy to establish guilt beyond a reasonable doubt unless corroborated." (*People v. Tewksbury* (1976) 15 Cal.3d 953, 967.) Here, the corroboration instructions effectively subjected Nieto's and Mikaelian's testimony to a harsher standard than an instruction to view their testimony "with caution," as it required the jury to examine whether their testimony was at least partly confirmed by independent evidence.

In addition to the corroboration instructions, the jury was instructed pursuant to CALJIC No. 2.20 on witness credibility to consider, among other things, the existence of "bias, interest, or other motive" in weighing the credibility of a witness (see Evid. Code, § 780), and with CALJIC No. 2.21.2 that "[a] witness who is willfully false in one material part of his or her testimony, is to be distrusted in others." "To the extent defendant argues the jury should have been instructed to view [Nieto's and Mikaelian's] testimony with distrust (CALJIC No. 3.18), we find the other instructions given— including '[a] witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others' (CALJIC No. 2.21.2), along with instructions on a witness's

16

credibility (CALJIC No. 2.20), and the character of a witness for honesty or truthfulness or their opposites (CALJIC No. 2.24)—were sufficient to inform the jury to view [their] testimony with care and caution, in line with CALJIC No. 3.18." (*People v. Lewis* (2001) 26 Cal.4th 334, 371.) "[W]e have no doubt that the jurors viewed [the] testimony [of Nieto and Mikaelian] with extreme caution." (*People v. Jones* (2003) 30 Cal.4th 1084, 1113.)

**Instructions Regarding Testimony Where Witness Has Been Granted Immunity**

Defendant further contends that the trial court erred in refusing to give his proposed special jury instruction No. 5, or alternately in modifying bracketed language in CALJIC No. 2.20 to state that the jury may consider a witness's grant of leniency in evaluating the truthfulness of his testimony, rather than stating that the jury may consider a witness's grant of immunity. There is no merit to these arguments.

Defendant proposed special jury instruction No. 5, which reads: "The testimony of a witness who provides evidence against a defendant for immunity from punishment, or for any other personal advantage, must be examined to determine whether this testimony has been affected by the grant of immunity, by personal interest, by expectation of reward, or by prejudice against the defendant."

In a hearing outside of the presence of the jury, the trial court determined that the special instruction was unnecessary, because it planned to give CALJIC No. 2.20, which covered "whether the witness is testifying under a grant of leniency."

Defense counsel argued: "It's just that we had so much testimony on leniency. It wasn't one witness. It was two witnesses getting, you know, special deals from the prosecution, and it seems to me that this expands a little bit on what is in [CALJIC No.] 2.20. It says, 'whether the witness is testifying under a grant of leniency.' And we have a grant of immunity and a grant of leniency. [¶] It seems to me that this doesn't address immunity, number one, 2.20 doesn't. And these witnesses did get immunity, and I think

this is just a better statement of the law with regard to this issue. It really should be given to this jury."

The trial court did not give the jury special instruction No. 5, but instructed under CALJIC No. 2.20 as follows:

"Every person who testifies under oath or affirmation is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.

"In determining the believability of a witness you may consider anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following:

"The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness testified;

"The ability of the witness to remember or to communicate any matter about which the witness has testified;

"The character and quality of that testimony;

"The demeanor and manner of the witness while testifying;

"The existence or nonexistence of a bias, interest, or other motive;

"The existence or nonexistence of any fact testified to by the witness;

"The attitude of the witness toward this action or toward the giving of testimony;

"A statement previously made by the witness that is consistent or inconsistent with his her [sic] testimony;

"An admission by the witness of untruthfulness;

"Whether the witness is testifying under a grant of Leniency."

In its original form, the last portion of CALJIC No. 2.20, provides for consideration of a grant of immunity, rather than a grant of leniency.

The trial court did not err in refusing to give special jury instruction No. 5. Numerous cases have held that it is inappropriate to instruct that the jury must consider a witness's grant of immunity, or that a grant of immunity must be viewed with a greater level of caution or scrutiny than other factors that may be considered under CALJIC No.

18

2.20. (*People v. Vines* (2011) 51 Cal.4th 830, 882 (*Vines*) [trial court properly rejected defendant's request that the jury be instructed to view witness with use immunity's testimony "with distrust"]; *People v. Hunter* (1989) 49 Cal.3d 957, 976-978 (*Hunter*) [not error to reject defendant's request that the jury be instructed to view immunized witness's testimony with "suspicion" and "greater care and caution"]; *People v. Hampton* (1999) 73 Cal.App.4th 710, 721 (*Hampton*) [no obligation to give defense instruction to view immunized witness's testimony "with distrust"]; *People v. Echevarria* (1992) 11 Cal.App.4th 444, 449 (*Echevarria*) [not error to reject instruction that immunized witness's testimony "should be viewed with distrust" and the jury "must assess the testimony of an immunized witness with caution because of the considerable interest such a witness has in testifying in a manner which is acceptable to the prosecutor"].) Those cases have held that it is appropriate to instruct the jury, under CALJIC No. 2.20, that it may consider a witness's grant of immunity. (*Vines*, *supra*, at p. 882; *Hunter*, *supra*, at p. 976; *Hampton*, *supra*, at p. 721; *Echevarria*, *supra*, at p. 450.) Here, it was not error to reject special jury instruction No. 5, which would advise the jury that the testimony of an immunized witness "must be examined to determine whether this testimony has been affected by the grant of immunity, by personal interest, by expectation of reward, or by prejudice against the defendant." Jurors *may* consider this factor, but are not required to, and it was appropriate for the trial court to instruct on immunized witnesses under CALJIC No. 2.20.

Moreover, substitution of the "leniency" in place of "immunity" in the final provision of CALJIC No. 2.20 was not error. We know of no case law requiring the inclusion of the specific word immunity, and defendant has pointed to none. The factors that the jury may consider under CALJIC No. 2.20 are broad. The jury is advised that "[i]n determining the believability of a witness you may consider anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness," and that the jury is not limited by the listed factors. Several of the listed factors also necessarily encompass consideration of a grant of immunity, such as: "[t]he existence or nonexistence of a bias, interest, or other motive[,]" and "the existence or

19

nonexistence of any fact testified to by the witness." In the context of this case, the court's substitution of "leniency" for "immunity" still conveyed to the jury the essential notion that the treatment afforded Nieto and Mikaelian warranted consideration by the jury, if appropriate.

Regardless, any error was harmless. As discussed above, the jury was thoroughly instructed on the requirement of corroboration for accomplice testimony. (See CALJIC Nos. 3.11, 3.12, 3.13.) Requiring corroboration of testimony goes well beyond the mere consideration of specific factors. Both witnesses testified extensively regarding their "deals," and the benefits they would receive for testifying in a manner favorable to the prosecution. Defense counsel repeatedly argued that Nieto and Mikaelian had strong motives to testify against defendant. There is no doubt that the jury considered Nieto and Mikaelian's immunization, and many other factors favorable to defendant, when evaluating their testimony.

**Ineffective Assistance of Counsel**

Defendant next asserts that trial counsel rendered ineffective assistance by failing to request limiting instructions with respect to the use of Nieto's and Mikaelian's guilty pleas. He argues that the jury should have been advised that their guilty pleas could not be used as evidence of his guilt, and that it is reasonably probable the outcome of the trial would have been different if such instructions had been given. Defendant's claim lacks merit, because even if defense counsel's failure to request limiting instructions was objectively unreasonable, defendant did not suffer prejudice.

Defendant has the burden of proving ineffective assistance of counsel. (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.) In order to establish such a claim, defendant must show that his counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) "If the defendant makes an insufficient showing on either one

20

of these components, the ineffective assistance claim fails." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, at p. 694.)

"If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*People v. Carter*, *supra*, 36 Cal.4th at p. 1189.) Here, the record is silent on the issue raised by defendant, so it must be addressed in a habeas corpus petition.

If the issue were properly before us, it would fail on the merits. Defendant relies on *United States v. Halbert* (9th Cir. 1981) 640 F.2d 1000 (*Halbert*), for the proposition that trial courts have a sua sponte duty to give instructions limiting the jury's consideration of the guilty pleas to the issue of credibility. He argues that if a trial court's failure to give limiting instructions sua sponte is reversible error, it follows that the limiting instructions are always beneficial to defendants, and defense counsel's failure to request them constitutes ineffective assistance of counsel.

We are not bound by decisions of federal appellate courts (*People v. Williams* (1997) 16 Cal.4th 153, 190), and we do we not find *Halbert's* reasoning particularly convincing. But even if we were to follow the reasoning of *Halbert* and accept defendant's argument, defendant has failed to establish ineffective assistance of counsel, because he was not prejudiced by counsel's failure to request the instruction. (*People v. Holt* (1997) 15 Cal.4th 619, 703 [reviewing court may determine if defendant has established prejudice before examining whether counsel's performance was deficient].) Defendant is correct that the guilty plea of a codefendant is not admissible as substantive proof of a defendant's guilt. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1322; *People v. Leonard* (1983) 34 Cal.3d 183, 188-189.) However, in cases like this one, where a

codefendant testifies, his guilty plea is admissible to allow the jury to assess his credibility. (*People v. Lawley* (2002) 27 Cal.4th 102, 162.)

Defendant concedes the guilty pleas were properly admitted for the purpose of allowing the jury to assess Nieto and Mikaelian's credibility, and, in fact, defense counsel argued strenuously in closing argument that the pleas served as incentive for Nieto and Mikaelian to testify falsely to ensure their "deals." The former codefendants had a motive to plead guilty and implicate defendant in the murder in order to minimize their own involvement in the crime, which was made clear though their testimony. For its part, the prosecution never argued that the guilty pleas were evidence of defendant's guilt.

Moreover, Nieto and Mikaelian's guilty pleas were not admitted into evidence in a vacuum. Each codefendant was questioned concerning the guilty plea and its conditions. They were questioned concerning the murder and prior attempts, their participation in the events, and the defendant's participation. The prosecution relied on Nieto's and Mikaelian's testimony as substantive evidence, and used the guilty pleas to establish the truthfulness of their testimony. It would be unreasonable to conclude that the jury relied on their guilty pleas rather than their extensive testimony to determine the facts upon which it found defendant guilty of murder.

The direct and circumstantial evidence of defendant's involvement in Juarez's murder is truly overwhelming. The notion that the jury's verdict was tipped toward guilt because the jurors considered the guilty pleas of Nieto and Mikaelian as substantive evidence of defendant's guilt is not even a remote possibility on this record. Defendant has not established prejudice.

**Cumulative Error**

Defendant contends that even if the errors in this case considered individually do not require reversal, the cumulative effect of those errors was prejudicial, denied him due process, and requires reversal. We do not agree. We have found only one error by the

22

trial court in this case, which was unquestionably harmless and provides no basis for reversal of the judgment.  (Cal. Const., art. VI, § 13.)

**DISPOSITION**

The judgment is affirmed.


KRIEGLER, J.

We concur:


MOSK, Acting P. J.


MINK. J. *

---

* Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.